10 F.3d 1044
 UNITED STATES of America, Plaintiff-Appellee,
v.
William Kenneth BANKS, a/k/a Kenny, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
William Kenneth BANKS, a/k/a Kenny, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellee,
v.
Garry COPELAND, a/k/a Fat Garry, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Fernando Cumbo BLOW, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bruce Elliott BOONE, Sr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Samuel COLLINS, Jr., a/k/a Cross, a/k/a Cadillac Sam, a/k/a
Norristown Sam, Defendant-Appellant.
 Nos. 91-5025, 91-5030 and 91-5071 to 91-5074.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 7, 1992 in Nos. 91-5030, 91-5071 to 91-5074.
Argued June 2, 1992 in No. 91-5025.
Decided Nov. 24, 1993.
 
 Bobby Wayne Davis, Virginia Beach, VA, argued, for defendant-appellant Banks.
 Edward Reif, Philadelphia, PA, argued, for defendant-appellant Collins.
 Sa'ad El-Amin, El-Amin & Associates, P.C., Richmond, VA, argued, for defendant-appellant Boone.
 Paul Henderson Ray, Virginia Beach, VA, argued, for defendant-appellant Copeland.
 Kenneth Bruce Wills, Norfolk, VA, argued, for defendant-appellant Blow.
 Charles Dee Griffith, Jr., Asst. U.S. Atty., Norfolk, VA, argued (Richard Cullen, U.S. Atty., Norfolk, VA, on brief), for plaintiff-appellee.
 Before WIDENER and PHILLIPS, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PHILLIPS, Circuit Judge:
 
 
 1
 These are the consolidated appeals of five defendants, William Kenneth Banks, Fernando Cumbo Blow, Bruce Elliott Boone, Samuel Collins, and Garry Copeland, who were tried, convicted, and sentenced for conspiracy to distribute heroin, cocaine, and crack cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and for various related substantive offenses, and a cross-appeal by the Government that challenges the Guideline sentence imposed on Banks. We affirm as to all.
 
 
 2
 * This is what has come to be a classic drug conspiracy case in which a large number of persons, here fourteen, are originally charged with engaging over time in a large-scale single conspiracy to possess for distribution and to distribute drugs, along with specific acts of possession, distribution and related offenses within an urban market area, and in which a number of those charged, here six, plead guilty under plea agreements and testify as Government witnesses against their confederates while others, here three, flee to escape trial, leaving the rest, here five, to be tried, convicted, and sentenced. Here, the urban market area was in Tidewater Virginia, in and around Portsmouth, Chesapeake, Virginia Beach, and Norfolk, with connections to market supplies and suppliers in Philadelphia and New York, and the conspiracy one that operated successfully for almost seven years from 1984 until 1990.
 
 
 3
 More specifically, the evidence, as principally developed by the testimony of co-conspirators and the wire-tapped conversations of various participants in the conspiracy, and as considered in the light most favorable to the Government, tended to show the following. The conspiracy's origins probably began near the end of 1984, when Gary Weathers, ultimately Government informant and principal trial witness, was introduced to defendant Samuel Collins in Philadelphia, where Collins was then living, by defendant Garry Copeland, an acquaintance of Collins from their earlier days as neighbors in Chesapeake, Virginia, for the purpose of establishing a source of drug supply for Weathers. As a result, Weathers began purchasing drugs, first heroin, later cocaine, from Collins, which Weathers then either retailed through agents or re-sold to other distributors, including defendant Fernando Blow and his brother, Antonio Blow, in the Tidewater Virginia area. During the early years of the Collins-Weathers arrangement, Copeland operated as broker-courier between Collins in Philadelphia and various distributors, including Weathers, in the Tidewater area, taking money collected from the Tidewater distributors to Collins and then transporting drugs supplied by Collins back to Virginia. During this period, Collins frequently came down from Pennsylvania to Portsmouth, where he'd sometimes stay in his local girlfriend's apartment. On occasion Weathers, with Copeland present, would receive supplies of heroin from Collins in the Portsmouth apartment where Collins was staying, and on some of these occasions, Copeland would deliver to Collins money that Copeland had collected from other distributors in the area. During this same period, when Weathers was getting heroin from Collins about twice a month for distribution in the Tidewater area, Collins was also supplying heroin to defendant Boone, another acquaintance from earlier Chesapeake days, for distribution in the same general area. Boone and Weathers in fact sometimes met during this period in the Portsmouth apartment with Collins and Copeland, with Collins delivering heroin to both for their distribution operations, and receiving from Copeland money he had collected from various distributors in the area.
 
 
 4
 Beginning in 1986, Weathers began buying heroin in bulk from defendant Banks, some of which Banks in turn had bought from Boone. This heroin was also distributed by Weathers to sub-distributors in the area, including the defendant Fernando Blow, who carried on an extensive cocaine and heroin distribution operation from his heavily guarded residence in Portsmouth, where he maintained a substantial arsenal of firearms. As Weathers knew, Blow was also getting some of his heroin supply at that time from Banks, who was also then Weathers' supplier.
 
 
 5
 Sometime in late 1988, Weathers and Boone arranged for Weathers to begin buying heroin in bulk from Boone, an arrangement that lasted for about six months during which Weathers continued his distribution operation with the heroin supplied now by Boone. During this time, Boone was still getting his heroin in bulk from Collins who was also continuing to supply Banks.
 
 
 6
 Beginning in 1986, various low-level operatives directly associated with the particular endeavors of Blow, Weathers, Collins, Boone, or Banks were apprehended in the course of their operations. First, in October, 1986, DEA agents arrested a courier, Adillu, who came into Norfolk Airport from New York, in possession of around five and a half ounces of heroin which it later was revealed was to have been delivered to defendant Boone. Next, Rufus Hurdle, one of the indicted co-defendants who pled guilty, was arrested in November of 1986 while in possession of 900 grams of heroin that he had brought by plane from Newark to Norfolk for delivery to Banks, some of which in turn Banks was to deliver to Weathers. Finally, in August of 1988, Antonio Blow, brother of defendant Fernando Blow, was arrested in Chesapeake in possession of around seven and a half ounces of heroin that Weathers had received from Banks and in turn delivered to Antonio Blow for distribution in the area.
 
 
 7
 As a result of these arrests and the ensuing cooperation of those arrested, law enforcement officers began to concentrate on the five appellants and Weathers, all of whom had been identified by the persons arrested as principals in the drug distribution operations in which they were involved. Based upon the information given by these persons, together with pen register information obtained from telephones used by various ones of the principal suspects, the Government secured an order for wiretapping of cellular telephones used by Weathers, now identified as a principal middleman in the operation, and his chief lieutenants, Ricky Faulcon and James Small. Monitoring began in May of 1989 and continued until July, 1989, when Weathers was arrested. Thousands of telephone conversations were monitored in the process, many between Weathers and his suppliers and distributors of that time, including the defendants Collins, Boone, and Copeland. Many of the conversations, as later explained to the jury by Weathers testifying as Government witness, directly implicated those charged in the conspiracy.
 
 
 8
 As a result of several of the monitored conversations, it was learned in July of 1989 that Weathers, Small and Faulcon then had in their possession approximately a kilogram of cocaine. They were therefore arrested, and in short order Weathers entered into a plea agreement which obligated him to cooperate in further investigation of the suspected conspiracy. As part of this cooperation, Weathers made monitored telephone calls to Banks and Copeland in which he represented that he was in the penitentiary and wanted the help of each in carrying on his part of the drug distribution enterprise. Each, not knowing of the call to the other, agreed and actually undertook to do what Weathers requested. Banks, following Weathers' instructions, took delivery of approximately seven and a half ounces of "sham" heroin from an undercover agent acting as Weathers' courier. Copeland, acting similarly, took delivery of a quantity of "sham" cocaine, ostensibly given him for distribution on Weathers' account. Both were arrested in consequence of these sting operations set up with Weathers' cooperation.
 
 
 9
 Following the later arrest and indictment of the other defendants, Boone, Collins, Banks and Copeland were confined pending trial in the same cell block with two co-defendants, Linwood Taylor and Charles Hendricks, who both later pled guilty and testified as Government witnesses. While so confined, Boone and Banks both requested Hendricks to lie about some of the wiretapped telephone conversations that might implicate them. Boone threatened Taylor with harm if he testified against him, urged all those present to stick together, and described, with Collins' confirmation, techniques used by Collins to threaten delinquent drug purchasers.
 
 
 10
 In the indictment of the five appellants, along with nine others, that followed, all five were charged in Count One with a single conspiracy involving all fourteen named defendants and other persons unnamed, and extending from 1984 to 1990, to possess for distribution and to distribute heroin, cocaine, and crack cocaine in the Tidewater area of Eastern Virginia and elsewhere. In addition, Banks was charged with three substantive counts of possession and distribution (Counts Two, Six, and Nine); Blow, with three substantive counts of possession, distribution and intimidation (Counts Seven, Ten and Eleven); Collins, with two substantive counts of distribution, and facilitation (Counts Sixteen and Twenty-One); Copeland, with seven substantive counts of possession, facilitation and distribution (Counts Seventeen, Eighteen, Nineteen, Twenty, Twenty-Two, Twenty-Three and Twenty-Four); and Boone, with three substantive counts of facilitation, possession, and distribution (Counts Twenty-Six, Twenty-Seven and Twenty-Eight).
 
 
 11
 In the ensuing jury trial of the five appellants, all were found guilty of the conspiracy charged, and all but Banks were also found guilty of all the substantive offenses charged to them. Banks was found not guilty on each of the substantive counts of possession and distribution with which he was charged.
 
 
 12
 Following sentencing hearings, Blow, Boone, Collins and Copeland were each sentenced to life imprisonment on the conspiracy count, and to various lengthy sentences followed by periods of supervised relief, on the substantive counts on which each had been convicted, these to be served concurrently with their respective life sentences. Banks was sentenced to 310 months followed by five years of supervised relief on the conspiracy count, the only one of which he was convicted.
 
 
 13
 All the defendants appealed, and the Government cross-appealed Banks' sentence.
 
 
 14
 In a consolidated brief, the appellants raise a number of issues common to all, and a greater number specific to their individual cases. (1) All assign as error the district court's refusal to suppress the evidence obtained by virtue of the original wire-tap order. (2) All assign as error the court's response to the jury's request for clarification of certain instructions. (3) All but Blow assign as error the court's denial of their Batson motions claiming race-discrimination in the Government's exercise of peremptory challenges. (4) Boone challenges the sufficiency of the evidence to convict him on the conspiracy count. (5) Collins challenges the sufficiency of the evidence to convict him on the conspiracy count; assigns error to a portion of the court's instructions on the significance of the taped wiretap evidence; and assigns as error the court's enhancements of his sentence for leadership role and firearm possession. (6) Copeland challenges the district court's rejection of his double jeopardy claim, and assigns as error the court's enhancements of his sentence for firearm possession and for leadership role, and the amount of drugs for which he was held accountable in sentencing. (7) Blow challenges the sufficiency of the evidence to convict him on the conspiracy count. (8) Banks challenges the sufficiency of the evidence to convict him on the conspiracy count.
 
 
 15
 On its cross-appeal, the Government challenges the district court's refusal, in sentencing Banks, to hold him accountable for the entire amount of heroin that the court found had been distributed by the conspiracy.
 
 II
 
 16
 We first reject, without extended discussion, several of the assignments of error by the appellants, some common to all, some individual, as lacking merit.
 
 
 17
 * The district court did not err in denying the motion of all appellants to suppress the taped evidence of wiretapped conversations. The specific challenge is that the original authorization order, that of May 2, 1989, was made without probable cause and was made on the basis of stale information. We have carefully reviewed the district court's extensive memorandum opinion finding probable cause and rejecting the staleness claim, and the affidavit upon which the finding was based. The court properly applied the standards of Aguilar v. Texas, 378 U.S. 108, 109, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723 (1964), in assessing and accepting the reliability of the information in the affidavit originating with informants, and the standards of Sgro v. United States, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932), in assessing and rejecting appellants' claim of staleness. The court's ultimate conclusion, having so assessed the affidavit, was that probable cause supported issuance of the authorization order. No separate challenge is made to the later extensions of the order.
 
 B
 
 18
 The Batson challenges of all the appellants except Blow are without merit. The Government prosecutor here exercised six peremptory challenges in the process of selecting the sitting jury panel. Four were employed to strike black jurors. The petit jury as finally composed consisted of seven whites, four blacks, and one Oriental. This was roughly in the same proportion as that reflected in the original venire from which the twelve-person jury was selected. The district court properly required the Government to come forward with the reasons for its peremptory strikes of black jurors, in view of the number of strikes used and the jury's ultimate composition. The reasons then offered by the prosecutor--unemployed status, suspected alcoholic, family member resident in neighborhood in which some defendants now or formerly resided, shabby dress suggesting irresponsible attitude toward jury service, criminal history--were not intrinsically suspect, were adequately supported by observable fact and were therefore properly determined by the court to be race-neutral.
 
 C
 
 19
 The challenge of all appellants to the way in which the trial court responded to a jury request, during deliberation, for clarification respecting the court's instructions on conspiracy is without merit. The jury requested copies of 21 U.S.C. Sec. 846, the drug conspiracy statute and of 18 U.S.C. Sec. 1952, the interstate travel statute, and asked specifically "If we find no conspiracy (Count I) exists, do we consider the rest of the counts?" At this point, defense counsel divided in their suggestions for how the inquiry should be handled: two requested that only the conspiracy portion of the instructions be repeated; two requested that the questions be simply answered directly; and one indicated no objection to re-reading the whole instructions originally given.
 
 
 20
 The district court chose to re-read the whole of the instructions originally given. This was a response well within the court's discretion, particularly in view of the different views of defense counsel.
 
 D
 
 21
 Turning to the individual assignments of error related to the various convictions, we first consider Copeland's double jeopardy claim. That claim, raised in the district court by a motion to dismiss the indictment in this case, is based on two separate challenges. The first is that Copeland's earlier federal conviction of drug possession and distribution and telephone facilitation offenses barred his prosecution under the indictment in this case for the comparable substantive offenses charged in Counts 17-20, and 22-24. The district court correctly rejected this theory for the simple reason that the specific offenses successively charged, though of the same nature, occurred on different dates.
 
 
 22
 The other challenge related to the conspiracy count in the present case. Relying on Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), Copeland contends that his prior convictions for the substantive offenses occurring in 1990, during the period of the conspiracy charged, barred his prosecution on the conspiracy charge in this case because the same conduct is charged as overt acts in the conspiracy indictment. The district court properly rejected this challenge on the basis that because overt acts are not elements of a Sec. 846 conspiracy, they cannot be considered the "same offense" for double jeopardy purposes. See United States v. Clark, 928 F.2d 639 (4th Cir.1991); see also United States v. Felix, --- U.S. ----, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992) (restricting scope of Grady v. Corbin 's former jeopardy protection).
 
 E
 
 23
 Collins' contention that the district court committed reversible error by instructing the jury that in his opinion the taped-conversation evidence was the focal point of the case, and that they might well branch out from there in considering the guilt of particular defendants, has no merit. This general expression of opinion on the importance of particular evidence lay well within the discretion of the court.
 
 F
 
 24
 We next consider the most difficult issues raised respecting the guilt phase of the trial: whether the evidence was sufficient to support the respective convictions on the conspiracy count of Banks, Blow, Boone, and Collins, each of whom (but not Copeland) made and preserved an appropriate challenge to its sufficiency as to him.[1] As is usual, these challenges take two forms: first, (by Banks, Boone, and Collins) that the evidence was insufficient to prove the single conspiracy charged as implicating anyone, that, instead, it established only multiple conspiracies, in some of which they essentially conceded their participations; second, (by Blow as well) that in any event the evidence was insufficient to establish his own participation in such a single conspiracy if it were proven.
 
 
 25
 We apply in review the same standard of sufficiency of the evidence applicable in the district court: whether "any rational trier of fact could have found the essential elements of the [conspiracy here charged in the indictment] beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and do so by assessing the evidence in the light most favorable to the Government, "assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced." United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991).
 
 
 26
 Though the issues whether the evidence was sufficient to support the jury finding that the single conspiracy charged did exist (whether or not it would have supported findings of others) and whether, if so, it also was sufficient to support findings of the participation in that very conspiracy of particular defendants, are conceptually distinct, they are so intertwined in the required evidentiary assessment that we approach them so. We start with the basic proposition that the issue whether a single conspiracy charged or, instead, only multiple conspiracies not charged have been sufficiently established by the evidence is an issue for the jury--being merely a special version of the fundamental issue whether the conspiracy charged has been proven. United States v. Urbanik, 801 F.2d 692 (4th Cir.1986). No appellant now raising this issue requested an instruction that would have allowed the jury to find multiple conspiracies, and none objected to the entirely proper single conspiracy instructions given.
 
 
 27
 Here, though each of the appellants making these intertwined challenges to the sufficiency of the evidence has, of course, his special emphasis on his own noninvolvement, there is a common theme with all who challenge sufficiency on this fundamental basis. It could be summarized as being that the evidence did not suffice in the end to show the requisite agreement between the persons charged to carry out the widespread, long continued drug distribution enterprise, involving heroin, cocaine, and crack cocaine, that was charged in the indictments. Rather, the arguments run, all that was shown was a series of episodic drug purchases and sales involving various ones of the alleged co-conspirators, some wholesale, some retail, some handled directly, some by brokers, some peaceable, some accompanied by threats of violence, all involving alleged co-conspirators who maintained no steady relationships with each other in particular roles, did not all deal in all of the drugs charged, were not shown to be organized in any discernible structure, and were as often in competition as in cooperation with each other's drug trafficking endeavors. And each of these appellants then contends specifically that the evidence fails sufficiently to connect him, in any event, to any such large-scale conspiracy as was charged and might have been proven.
 
 
 28
 To emphasize their specific contentions, we summarize the evidence specifically related to each of these appellants, necessarily repeating some of that given in our general summary in Part I.
 
 BANKS
 
 29
 There was evidence that from 1982 into 1989, Kenneth Banks was a major middleman distributor of bulk heroin for re-distribution in the Tidewater Virginia area. In particular, the evidence established that from 1984 to 1986 he regularly supplied Gary Weathers with large amounts of heroin--15.02 kilograms over the period in packages of around seven and a half ounces--for re-distribution by Weathers through the extensive retail distribution operation that Weathers directed. There was also evidence that Banks at one time supplied Fernando Blow with heroin in bulk for re-distribution by Blow through his extensive retail distribution operation. Banks was shown by the evidence to have obtained some of his supply from an unidentified New York source, and for a time in 1989, from appellant Boone. Finally, there was evidence that when requested by Weathers, in a monitored telephone call following the latter's arrest, to aid Weathers by distributing a quantity of drugs on Weathers' account, Banks willingly complied.
 
 
 30
 Banks emphasizes that despite this evidence of his extensive involvement as a middleman distributor of heroin in the Tidewater area during the period of the conspiracy, no evidence linked him in dealings with either Collins or Copeland, nor with any drug but heroin. And of course, he points to his acquittal on each of the three substantive offenses with which he was charged.
 
 FERNANDO BLOW
 
 31
 There was evidence that Blow operated an extensive heroin and cocaine retail distribution enterprise in the Tidewater area during the period of the conspiracy charged. The evidence showed that he received some of his heroin supply from Weathers and, when he fell out with Weathers, from Banks.
 
 
 32
 Blow emphasizes that despite the evidence of his heavy involvement in retail distribution of both heroin and cocaine, he was only linked by that evidence to two others of the alleged conspiracy, Weathers and Banks. He also points out that he was not identified either as a participant in nor the subject of any but one of the many monitored telephone conversations involving Weathers and Weathers' chief lieutenants. Finally he notes that no evidence identified the source of his cocaine.
 
 BOONE
 
 33
 There was evidence that Boone was a major supplier of heroin for re-distribution in the Portsmouth area during the period of the conspiracy, and that he acted in direct concert with others of the alleged co-conspirators. Specifically, there was evidence that he supplied Banks in 1989, and Weathers over a six-month period in 1985-1986, with heroin for re-distribution by those alleged co-conspirators, and that from time to time between 1985 and 1990, he supplied Charlie Hendricks and Linwood Taylor (both indicted co-conspirators who pled guilty) with large quantities of heroin for distribution in the Tidewater area. Finally, there was evidence that at one time Boone had worked directly for Collins, and had entered into an arrangement with Collins under which Boone would distribute drugs in eastern Virginia, Collins in Philadelphia.
 
 
 34
 Boone emphasizes that no evidence linked him in any drug dealings or related activity with either Copeland or Blow, and that the only drug to which he was linked was heroin.
 
 COLLINS
 
 35
 There was evidence that during the period of the conspiracy charged, Collins, operating primarily out of Philadelphia, but on occasion visiting the Tidewater area, was a major supplier of heroin and cocaine for distribution by various of the alleged co-conspirators in that area, where Collins had once lived. Specifically, there was testimony that from 1984 to 1986 he sold ounce amounts of heroin to Weathers about twice a month and that in the summer of 1989, he again supplied Weathers on at least two occasions with ounce amounts. Other testimony established that Boone worked directly with and for Collins in distributing heroin in the Tidewater area, and that Copeland also worked directly with Collins as a heroin broker, distributing heroin supplied by Collins to middlemen dealers, including Weathers and Boone, and collecting money from those dealers for Collins.
 
 
 36
 Collins emphasizes that notwithstanding the evidence linking him in drug dealings with Weathers, Boone, and Copeland, none links him in any drug dealings or related transactions with either Banks or Blow.
 
 COPELAND
 
 37
 Copeland's involvement in drug trafficking in the area and time period of the conspiracy charged, and with others of the co-conspirators charged, was extensively developed in the evidence. It identified him as a heroin broker who worked between Collins as supplier and various middlemen dealers, including Weathers and Boone, from whom he collected money for remittance to Collins. During some of this period, he kept large quantities of heroin in his home, and he occasionally sold cocaine in the Tidewater area. His relationships with Collins, Weathers, and Boone in various drug trafficking transactions were well established by the testimony of participants and observers. Finally, his relationship with Weathers was confirmed by the sting operation in which Weathers, following his arrest, was able to enlist Copeland's aid in a sham drug transaction ostensibly on Weathers' account.
 
 
 38
 Notwithstanding this evidence of his extensive drug dealing relationships with various of the co-conspirators charged, Copeland emphasizes that none linked him in any direct relationship with either Banks or Blow.
 
 
 39
 Though the appellants challenging the sufficiency of the evidence to establish the single conspiracy charged--Banks, Boone, Collins and Copeland--each advance separate arguments emphasizing its special weakness with respect to him, a common theme runs through them. It concentrates on the failure of the evidence to establish direct transactional links, or even acquaintanceship, between all those charged as members of the conspiracy. And it emphasizes that the evidence essentially consists of testimony about a great number of discrete buy-sell transactions between various ones of the alleged co-conspirators, and nothing either directly or inferentially probative of any discernible hierarchical organization in which they were linked. They point to the important principle that while evidence of such discrete buy-sell transactions is indeed probative of criminal activity, courts should "not assume, ab initio, that they carry with them the excess baggage of conspiracy," for the agreement between the parties to any such transaction "may not transcend the scope of the transaction itself." United States v. Townsend, 924 F.2d 1385, 1392 (7th Cir.1991). This, in effect, appellants say, is all that was proven here: at most a number of conspiracies of a more limited nature than the single one charged--separate agreements between suppliers and middlemen, middlemen and wholesalers, wholesalers and street dealers, some brokered, some direct, but no single agreement defining the grand conspiracy charged. In particular, it is argued, it is important to keep in mind that given the fact that there is after all a finite supply of drugs "[t]hose in the market to sell or buy large quantities (for distribution) are just as likely, if not more, to be competitors as collaborators." Id. at 1393. Picking up on this reality of the contemporary drug distribution enterprise, appellants point to those aspects of the evidence that suggest more of competition than of collaboration between some of the alleged principals in the conspiracy, as when Blow ceased buying heroin from Weathers and turned to Banks, and when Weathers turned from Collins to Banks as his heroin source of supply. And of course all emphasize the in-and-out, role-changing relationships between the various alleged co-conspirators that is unmistakably reflected in the evidence.
 
 
 40
 Taking into account all these wise cautionary legal principles and the inevitable gaps in the evidence of the conspiracy's total scope and operation, we are nevertheless satisfied that both the single conspiracy charged and the participation in it of each of the appellants challenging it was sufficiently proven.
 
 
 41
 It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence. Critically, it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure; the requisite agreement to act in concert need not result in any such formal structure, indeed frequently, in contemporary drug conspiracies, contemplates and results in only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market (and, undoubtedly on the part of some, by fear of the consequences of abandoning or subverting the enterprise). Furthermore, the fact that parallel suppliers, or middlemen, or street dealers serving such a market may sometimes, or even always, compete for supplies or customers in serving that market does not on that account alone disprove either the existence of a single conspiracy to achieve the overall results of their several efforts, or the participation of particular ones of them in that conspiracy. In consequence, a more important consideration than the fact of economic competition between various participants in an overall endeavor to feed and profit from the appetites of the ultimate consumers in such a market is whether the various participants had to know "from the nature of the contraband and the vastness and regularity of their own dealings ... that [the illegal efforts of others] were required to make their own dealings possible." United States v. Burman, 584 F.2d 1354, 1356 (4th Cir.1978). And, by like token, a more important consideration than competition in determining the membership of particular actors in an overall conspiracy to supply such a market is whether the actor "demonstrated a substantial level of commitment to the conspiracy, [for example] by engaging in a consistent series of smaller transactions" that furthered its ultimate object of supplying the consumer demand of the market. United States v. Edwards, 945 F.2d 1387, 1393 (7th Cir.1991).
 
 
 42
 Assessed in light of these principles, the evidence here was sufficient to support a finding that the single conspiracy charged did exist, and that all of the appellants--Banks, Blow, Boone, Copeland, and Collins--were members of that conspiracy. The specific charge was of one in which the "defendants [appellants] and unindicted co-conspirators would and did make themselves and their services available at various times throughout the conspiracy on an 'as needed' basis," and in which they "assumed ... interchangeably at various times throughout the conspiracy ... roles that ... included, among others: financier, organizer, manager, driver, supplier, distributor, packager and courier." J.A. 40 (Indictment).
 
 
 43
 From the evidence we have summarized, once generally and once again as to each of the appellants, the jury reasonably could have inferred exactly the sort of loosely-knit conspiracy charged. In particular, they reasonably could have inferred a concerted undertaking by those charged by name, and others unknown, to develop and maintain over the period charged a massive consumer market for heroin and cocaine in the general Tidewater area of Virginia that included Portsmouth, Chesapeake, Virginia Beach and Norfolk. Though no formal structure could have been inferred, the interdependence of participants charged and uncharged in pursuing this ultimate illegal object, easily could be. At its center were the efforts of Weathers, as developed in his own testimony, as principal middleman in an operation in which Collins was a principal supplier of heroin and cocaine, Boone a major player, sometime supplier, sometime middleman between suppliers and street dealers, and Copeland an all-purpose broker, courier, and collector.
 
 
 44
 Though undoubtedly more on the periphery, the participation of Banks and Blow in this conspiracy was also readily inferable--Blow as a principal street retailer of both heroin and cocaine from his Portsmouth residence, Banks as an occasional supplier of heroin to others of the principals, specifically Weathers and Blow, from stocks he in turn obtained from unidentified New York sources and at least once from Boone.
 
 
 45
 Blow claims that the evidence linking him in any way with any such conspiracy as that charged or with any of its proven members consists of no more than "a single transaction" with Weathers and an unspecific relationship with Banks, to whom he turned for heroin supply following the one proven transaction with Weathers. He also points to the testimony of various prosecution witnesses that he had no connection with any of the "other defendants" [than Banks?] and was never mentioned by, or seen with, any of them. Finally, as indicated in our earlier summary, he emphasizes the negative evidence that he was never identified as participant or subject in any but possibly one of the many telephone calls monitored by the government wiretap, and that his cocaine supplier was not identified. Appellants' Br. 55-57.
 
 
 46
 This considerably shades and understates the relevant evidence of Blow's conduct. The "single transaction" with Weathers upon which he relies was, as Blow concedes, one in which he purchased a substantial quantity (a "big ounce") of heroin from Weathers. The contention that this was the total extent of his proven relationship with Weathers (and, by implication, with the conspiracy charged) is derived from a single snippet of Weathers' testimony which could be interpreted to indicate that Blow turned to Banks after this one transaction, but which is actually inconclusive on that point. See Tr. 292-93 ("... the second time I went to him (Blow) and asked him did he want some, he told me he didn't ..."). Against any implication to that effect, there was other testimony that indicated a more continuous course of dealing, either directly or through an intermediary, between Weathers as supplier and Blow as purchaser of heroin for redistribution. See Tr. 251, 290 (Weathers testimony); id. 775-77 (Delores Blow testimony); id. 773 (Tyrone Wallace testimony); id. 871 (Wallace as intermediary). Here of course, as generally, the Government is entitled to the most favorable possible inferences from conflicting or even internally inconsistent evidence, and if the most favorable evidence respecting the relationship between Weathers and Blow is credited, it supports an inference of a much more substantial relationship than the single transaction that Blow identifies.
 
 
 47
 The fact that several of the prosecution's witnesses did not happen to know first-hand of any connection between Blow and the "other defendants" of course is probative of nothing beyond that lack of knowledge. Nothing in the evidence suggests that had there been such connections these witnesses necessarily would have known of them. In any event, Blow's relationship with others linked by the evidence to the conspiracy, including his wife and his brother, Antonio, was amply supported by the evidence. Similarly, the fact that Blow's name did not turn up either as participant or subject in the monitored telephone calls, though obviously favorable to his position, as obviously is not conclusive in his favor. From the other evidence available to it, the jury reasonably could have inferred that this negative evidence indicated no more than that Blow was a more circumspect operator than were his colleagues who made free and imprudent use of this form of communication.
 
 
 48
 In sum, the jury reasonably could infer from the totality of the evidence that Blow played a vital role, as the successful operator of a major street-level drug distribution outlet, in carrying out the fundamental purpose of the single conspiracy charged--to supply and derive profits from the ultimate drug consumer market that it fed upon in urban Tidewater Virginia during the years charged. That Blow may have confined his role more than did others of the co-conspirators to a single function; that his relationships with others in this conspiracy may not have been always harmonious; and that he may have maintained a greater degree of autonomy than did others in the conspiracy, cannot of course defeat that inference. The critical fact, well supported in the evidence, indeed conceded by Blow, was that during the period charged and in the very heart of the geographical area charged as the conspiracy's operational focus, Blow conducted a massive street-level distribution operation of the type vital to the success of any such drug conspiracy as that charged. He either was able to do so at odds with the interests of a conspiracy in which he did not participate, or as a participant in it. From the mere fact that he was able to conduct so substantial an operation over the period charged without hindrance, given the known violence with which drug distribution markets are maintained in these tragic times, the jury reasonably could infer participation in, rather than independence from, the overall distribution enterprise that was well-established in the evidence.
 
 
 49
 Banks' contention of the insufficiency of the evidence to establish the conspiracy charged and, more specifically, his participation in it, emphasizes, as did Blow's two main points: that he was not identified in any of the monitored telephone calls as either participant or subject, and that the only evidence linking him with any of the other alleged co-conspirators was a "single relationship with Weathers." Appellants' Br. 53. To these, he adds the further point that the jury acquitted him on all three of the substantive possession and distribution counts with which he was charged.
 
 
 50
 As was said of Blow's contentions about the confinement of the evidence against him to a "single transaction" with Weathers, Banks' contention of its confinement to a "single relationship with Weathers" considerably shades and understates the evidence. As earlier indicated, the total evidence before the jury identified Banks as a regular supplier of substantial amounts of bulk heroin to Weathers at one time, as also a supplier of Blow's, and as a purchaser of heroin for re-distribution from Boone and from an unidentified New York source. There were conflicts in the testimony bearing upon his relationships with these others, and some of it was the uncorroborated plea-bargained testimony of the turncoat informant, Weathers, but if assessed in the light most favorable to the Government, it suffices to support jury findings of the relationships indicated. And, for the reasons developed in our discussion of Blow's contentions, the evidence sufficed to support a finding of Banks' participation in the general conspiracy charged. As with Blow, the jury reasonably could infer from that evidence that Banks had "demonstrated a substantial level of commitment to the conspiracy ... by engaging in a consistent series of ... transactions" that furthered its ultimate purpose. Edwards, 945 F.2d at 1393. Not of course conclusive standing alone, but certainly a clincher with respect to Banks' continuing relationship with the conspiracy through Weathers--in many ways the central figure in the conspiracy proven--was his willing response to Weathers' entreaty--set up by the Government following Weathers' arrest--to make a sale of drugs on Weathers' account. As was the case with Blow, the jury reasonably could have inferred from the overall evidence that Banks was a participant in, rather than an operator independent of and in competition with, the conspiracy charged.
 
 
 51
 We therefore reject the respective challenges by Banks, Boone, Blow, and Collins to the sufficiency of the evidence to convict each of the single conspiracy charged in Count One of the indictment.
 
 III
 
 52
 We turn now to specific challenges by Collins and Copeland to the sentences imposed upon them under the Sentencing Guidelines.
 
 
 53
 Each challenges the amount of drugs attributed to him in sentencing on the conspiracy count, a four-point enhancement for leadership role in the conspiracy, and a two-point enhancement for firearm possession. We find no merit in any of these challenges.
 
 
 54
 In calculating the base offense level for sentencing each on the conspiracy count, the district court attributed to both Collins and Copeland the total amount of heroin and cocaine found to have been distributed through the conspiracy's efforts during the period charged.[2] The total amount so attributed thus included significant amounts of both drugs not shown to have been distributed or possessed for distribution by either of these defendants, but by others involved in the conspiracy. To include those amounts in the total for which these two defendants could properly be held accountable, the conduct of those others must have been both "in furtherance of the jointly undertaken activity" with the particular defendant, and "foreseeable [by that defendant] in connection with the criminal activity." United States Sentencing Commission, Guidelines Manual, Sec. 1B1.3. Here the district court expressly found the requisite foreseeability by both Collins and Copeland, and, implicitly at least, found that the conduct of others in the conspiracy for which both of these defendants were held accountable for drug quantity purposes was in furtherance of the activity jointly undertaken with each. Those determinations are essentially findings of fact that we review under the clearly erroneous standard. See United States v. Daughtrey, 874 F.2d 213 (4th Cir.1989). So reviewing them, we cannot find error. The district court, reviewing the evidence at trial and other presented by the Government at sentencing, properly determined that the involvement of Collins, as major supplier of both drugs for distribution and re-distribution by other members of the conspiracy, and Copeland, as heavily involved broker and sometime middleman supplier of both drugs, was sufficiently extensive to hold them accountable for the full amounts of drugs distributed by the conspiracy.
 
 
 55
 The same evidence sufficed to support the sentencing court's determinations, again ones of fact, that both Collins and Copeland had "leader or organizer" roles in a conspiracy that involved five or more participants, hence were subject to a four-level increase in their base offense levels under Guidelines Sec. 3B1.1(a).
 
 
 56
 In imposing sentences on Collins and Copeland, the district court also gave each two-level enhancements for the possession of firearms during commission of the conspiracy, pursuant to Guidelines Sec. 2D1.1(b) (enhancement provisions) and 1B1.3(a)(1)(B) (relevant conduct of others for which defendant accountable). This was done on the basis that although there was no evidence of the direct possession of firearms by either, it was reasonably foreseeable to each that other members of the conspiracy would, and did, possess firearms in furtherance of activity jointly undertaken with each of these defendants during commission of the conspiracy offense. See Guidelines Sec. 1B1.3(a)(1)(B).
 
 
 57
 Both Collins and Copeland challenge those enhancements. Collins, on the basis that the evidence did not support a finding that the possession by others was foreseeable to him. Appellants' Br. 46. Copeland, apparently, on the basis that enhancement is only proper for direct possession, and cannot be based on possession by others. Id. at 49. Neither contention has merit. The foreseeable possession of firearms by other members of a conspiracy during the commission of that offense may be attributed to a defendant who does not himself possess firearms, if the foreseeable possession occurs in furtherance of activity jointly undertaken with that defendant. Guidelines Sec. 1B1.3(a)(1)(B); United States v. White, 875 F.2d 427, 433 (4th Cir.1989). A sentencing court's determination that such an enhancement is warranted under this Guidelines provision is essentially a factual one that we review under the clearly erroneous standard. Daughtrey, 874 F.2d at 217. Here, we could not conclude that the district court's express and implicit findings of the requisite facts of "foreseeability" and "in-furtherance-of-jointly - undertaken - activity" were clearly erroneous. That firearms were actually possessed by other members of the conspiracy during its commission was indisputably established. See, e.g., J.A. 360. The evidence of both Collins' and Copeland's extensive involvement in leadership roles in central operations of the conspiracy, including their direct relationship with several co-conspirators, including Weathers, who concededly possessed firearms during their participation in the conspiracy amply supported the requisite findings.
 
 IV
 
 58
 We come finally to the Government's cross-appeal challenging the district court's imposition of sentence upon Banks. Specifically the Government assigns as error the court's decision to hold Banks accountable for only the 14.02 kilograms of heroin for whose distribution he was shown to be directly responsible, declining to hold him accountable for the total amount, 34.7 kilograms, concededly distributed through the conspiracy's operations.[3] As the Government points out, the district court did so despite an express finding that distribution of the total amount was reasonably foreseeable to Banks. See Banks Sentencing Transcript 79-80. This, the Government says, reveals a plain abuse of discretion in "disregarding the Guidelines," its contention apparently being that under the Guidelines ' relevant conduct provisions, all drugs whose distribution by others involved in a conspiracy is foreseeable to a particular defendant must be attributable to him. Government Br. 54-55. But that, of course, is not, as the district court expressly recognized, what the Guidelines provision, Sec. 1B1.3(a)(1)(B), provides. Rather, as the district court correctly noted, Banks Sentencing Transcript 79, there must be, in addition to foreseeability of the amount so distributed, the further fact that its distribution was "in furtherance of the jointly undertaken criminal activity," that is, the activity specifically undertaken by the defendant with those others. And, as the court pointed out, the Guidelines Commentary to this provision emphasizes that "because a count may be broadly worded and include the conduct of many participants over a substantial period of time ... the scope of jointly undertaken activity and hence relevant conduct, is not necessarily the same for every participant." Id. (obviously quoting, without specific citation, Application Note 1 to the 1989 version of the Commentary to Guidelines Sec. 1B1.3.)[4] Directly relying upon this Note, the court found that though Banks reasonably could have foreseen distribution of the total amount of heroin attributed to the conspiracy (and more), no more than the 14.02 kilograms with which he directly dealt could be found to have been distributed in furtherance of the specific, more limited activity which he jointly undertook with others. That is a finding of fact that we cannot conclude was clearly erroneous on the record before the district court at sentencing. Accordingly we affirm the sentence imposed on its basis.
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 A difficulty traceable primarily, of course, to the complexity and confusion of the evidence in this, as any, multi-defendant drug conspiracy case, but significantly compounded here by woefully unhelpful appellate practice by both Government and defense counsel. The trial transcript here ran to twenty-one volumes. The Federal Rules of Appellate Procedure, as applied in this circuit, contemplate that the parties, though admonished to avoid unnecessary designations, will cooperate at an early stage in seeing that all parts of the record "to which the parties wish to direct the particular attention of the court" are included in an appendix to the briefs. Fed.R.App.P. 30(a), (b). That cannot have been done here. The appendix filed was essentially a skimpy one for this type case--one wholly inadequate to permit the evidentiary assessment required by the critical sufficiency issues raised by appellants. The Government indeed noted this in its main brief, laying the inadequacy to the appellants, and citing it as reason for its "relying entirely upon the transcript for its Statement of Facts." Appellee's Main Br. 7, n. 1. But the inadequacy of the appellants' designation should, under the Rules, have been noted earlier by the Government in order to require expansion of the appendix rather than "entire reliance" upon the transcript of trial. See Fed.R.App.P. 30(b). This is a burden likely always to fall upon the Government when appellants indicate during the appendix-preparation process, see id., that they will raise evidence-sufficiency issues. Almost inevitably their designation of parts of the record supporting their contentions of insufficiency will be underinclusive. That obviously was what happened here. The result was a breakdown in the mandated appellate procedure process that yielded inadequate briefs and supporting record material and forced unnecessarily extensive, inadequately directed resort for adequate review to the record itself
 We go to this length in pointing out this breakdown because of the seriousness of its impact on our ability to conduct responsibly the difficult evidentiary review forced by evidence insufficiency issues. Particularly is that so where there is, as here, a non-frivolous claim in this type multi-defendant drug conspiracy case that the evidence proves not a single, but only multiple conspiracies. See, e.g., the appellate review conducted by the Seventh Circuit in United States v. Townsend, 924 F.2d 1385 (7th Cir.1991), in grappling with such a claim. We are well aware of the technically difficult problem faced by counsel in jointly composing a proper appendix to allow fair review of this type evidence-sufficiency issue, and that there are practical problems of volume and expense in addition to the basic technical problem of composition. But a better effort than could possibly have been made here is essential to efficient and fair appellate review.
 
 
 [2]
 34.7 kilograms of heroin, 39 kilograms of cocaine, amounts sufficient under the quantity tables to dictate the base offense levels used by the court
 
 
 [3]
 The court also declined to hold Banks accountable for any of the total amount of cocaine attributed to the conspiracy, on the basis that he was shown to have been involved--to have "jointly undertaken activity"--only in the conspiracy's heroin distribution operations. The Government does not, so far as we can discern from its brief, challenge this particular ruling. If challenged, the challenge would fail for the same reason given in text for rejecting the challenge to the heroin quantity ruling
 
 
 [4]
 This Note now appears as Application Note 2 in the current, 1993, version of the Guidelines, pursuant to the extensive 1991 clarifying amendments to Sec. 1B1.3 and its accompanying Commentary