Certiorari granted, October 1, 2012
Vacated by Supreme Court, October 1, 2012

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CURTIS LAKOY EDMONDS, a/k/a
Rude Boy,

*Defendant-Appellant.*

No. 10-4895

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, Senior District Judge.
(5:08-cr-00368-F-1)

Argued: January 27, 2012

Decided: May 8, 2012

Before NIEMEYER and KEENAN, Circuit Judges, and
J. Michelle CHILDS, United States District Judge for the
District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge Keenan and Judge Childs joined.

**COUNSEL**

**ARGUED:** Michael W. Patrick, LAW OFFICE OF MICHAEL W. PATRICK, Chapel Hill, North Carolina, for Appellant. Yvonne Victoria Watford-McKinney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF**: George E. B. Holding, United States Attorney, Jennifer P. May-Parker, Felice McConnell Corpening, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

A jury convicted Curtis Edmonds on one count charging him with conspiracy to traffic in more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846, and on three counts charging him with distributing crack cocaine, in violation of § 841(a)(1). The district court sentenced Edmonds to life imprisonment.

Challenging his conviction, Edmonds contends that while the evidence may have supported a finding of his involvement in simple buyer-seller drug transactions, it did not support a finding that he participated in any conspiracy. And challenging his sentence, he contends that (1) the district court failed adequately to consider the sentencing factors contained in 18 U.S.C. § 3553(a), and (2) the court improperly enhanced his sentence under 21 U.S.C. § 841(b)(1)(A) and U.S.S.G. § 4B1.1(a), based on his two prior North Carolina drug-trafficking convictions and our decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc) (construing North Carolina's sentencing scheme for purposes of applying federal sentencing enhancements).

Finding his arguments unpersuasive, we affirm.

I

After Justin Atkinson was arrested in November 2007 by Oxford, North Carolina police for possession with intent to distribute crack cocaine, Atkinson agreed to serve as a confidential informant for the police by engaging in controlled drug purchases from his suppliers. Atkinson provided Detective Kevin Dickerson with the identities of his suppliers and the types, quantities, and prices of drugs that he typically could purchase from each. One of the suppliers whom Atkinson identified was Curtis Edmonds, and under the supervision of Officer Dickerson, Atkinson entered into three controlled purchases of crack cocaine from Edmonds, each of which was recorded.

The first transaction took place on February 4, 2008. After Atkinson arranged to purchase 14 grams (one-half ounce) of crack cocaine from Edmonds for $450, Atkinson consummated the sale with money supplied by Officer Dickerson. During the transaction, Edmonds referred to Atkinson by his nickname, "Baby J," and confided that he had recently been in possession of four ounces, from which "Crowell bought a[n] ounce and a half" and "Jo-Jo came [and] got a half ounce." He also told Atkinson that he was "trying to get back to 425" as the price for 14 grams of crack and that "if [he] can get to a . . . big eight [one-eighth of a kilogram], [he is] gonna stop cooking it like that." At trial, Officer Dickerson explained that "cooking" referred to the conversion of cocaine powder into crack cocaine.

The second controlled purchase took place two days later, on February 6, 2008. After briefly haggling over the price, Edmonds and Atkinson completed the transaction with the same quantity and price as were involved in the transaction on February 4 — 14 grams of crack cocaine for $450. When Atkinson told Edmonds, "I don't want no bullshit[,] it better

be 14," Edmonds replied assuringly, "You know me." Right after the deal, Edmonds called Atkinson back and said, "I got another one you can get on face." At trial, Atkinson explained that "on face" referred to a consignment arrangement in which Atkinson would receive the drugs immediately and pay for them later. Atkinson testified that he had entered into similar consignment arrangements with Edmonds prior to the controlled purchases.

The third and final controlled purchase took place two weeks later, on February 23, 2008, when Atkinson bought a full ounce of crack cocaine for $1,000. During this transaction, Atkinson mentioned a person he knew who was willing to pay "terrible money" for cocaine, but Edmonds declined to meet the person, saying that he "ain't fixing to sell to him." At trial, Officer Dickerson explained that it was common for drug distributors to be cautious about entering into new relationships with unfamiliar people.

Officer Dickerson arrested Edmonds on June 26, 2008, and at the police station, after Officer Dickerson played a recording of his transactions with Atkinson, Edmonds agreed to talk about his drug dealing. He disclosed that he had started dealing with Atkinson in December 2007 and that he had sold Atkinson two ounces of crack on two occasions; one ounce of crack on two occasions; one-half ounce of crack on more than five occasions; and one-quarter ounce of crack on more than five occasions. Edmonds also described drug transactions with individuals other than Atkinson. After telling officers that he had begun selling cocaine at the age of 17 (16 years earlier), he explained more particularly that after he left prison in April 2007, he resumed dealing in drugs, beginning with $40 and gradually working his way into more money. He stated that from "Boss Man" he had purchased one-quarter ounce of crack on one occasion; one-half ounce on one occasion; one ounce on more than five occasions; one ounce plus 21 grams on more than five occasions; and two ounces (which were "cooked back" into four ounces) on one occasion. He

stated that from "Matt" he had purchased two ounces of powder cocaine on two occasions and that on each occasion he cooked the two ounces of powder into three ounces of crack. He stated that from Corey Bullock he had purchased one ounce of powder cocaine and from Marquis McCaven, "a gram or two at a time," but "no more than [3.5 grams]." Finally, Edmonds stated that he recalled selling "a gram or more" to Ricardo Smith on more than five occasions.

At trial, witnesses corroborated several aspects of Edmonds' confession. Atkinson testified not only to the controlled purchases but also to purchasing one-half ounce and full ounce amounts of crack cocaine from Edmonds prior to the controlled purchases. Indeed, Atkinson testified that Edmonds taught him how to cook powder cocaine into crack cocaine. Atkinson also stated that he, too, had engaged in drug transactions with Marquis McCaven, lending support to Edmonds' claim to have purchased drugs periodically from McCaven. Also at trial, Edmonds' former girlfriend, Aisha Christian, testified that based on her conversations with Edmonds, she knew that "he was making his money from selling drugs."

A jury convicted Edmonds of one count of conspiracy to distribute and to possess with intent to distribute over 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1), and three counts for distributing over five grams of crack cocaine on the dates of the controlled purchases, in violation of § 841(a)(1).

The district court sentenced Edmonds to a mandatory life sentence for the conspiracy conviction and 360 months' imprisonment for each of the distribution counts, with all sentences to be served concurrently.

This appeal followed.

## II

Count 1 of the indictment, on which the jury convicted Edmonds of conspiracy, charged that beginning in or about January 2007 and continuing until on or about June 26, 2008, Edmonds conspired with other unnamed persons "to distribute and to possess with intent to distribute more than 50 grams of cocaine base (crack)," in violation of 21 U.S.C. §§ 846 and 841(a)(1). Edmonds contends that the evidence before the jury was insufficient to convict him of this count. He argues first that the controlled drug transactions between him and Atkinson could not establish a conspiracy because Atkinson, as a government agent, lacked a genuine conspiratorial intent. And as to the evidence of prior, noncontrolled transactions with Atkinson, *i.e.*, before Atkinson acted as a government agent, he argues that the evidence supported only casual buyer-seller transactions, not a conspiracy. Finally, he contends that the government was not entitled to rely on his confession because it was uncorroborated and therefore could not, under *Wong Sun v. United States*, 371 U.S. 471 (1963), and *United States v. Stephens*, 482 F.3d 669 (4th Cir. 2007), be used to satisfy the government's burden of proof.

The government argues that the evidence of the relationship between Edmonds and Atkinson before Atkinson became a government agent supported the conspiracy conviction. It also relies on Edmonds' confession, focusing mostly on the portions of his confession regarding his prior drug dealings with Atkinson before Atkinson functioned as a cooperating government agent.

Of course, in evaluating the sufficiency of the evidence, we take the evidence in the light most favorable to the government and determine whether any rational trier of fact could conclude that it supported a finding of guilt beyond a reasonable doubt, in this case Edmonds' guilt of conspiracy. *See United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc).

"Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *United States v. Shabani*, 513 U.S. 10, 16 (1994) (quoting *Ianelli v. United States*, 420 U.S. 770, 777 (1975)). Thus, the crime of conspiracy "may exist and be punished whether or not the substantive crime ensues." *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)). Section 846 of Title 21, the crime of which Edmonds was convicted, provides that any person who "conspires to commit any offense defined in this subchapter [21 U.S.C. §§ 801-904 (addressing controlled substances)] shall be subject to the same penalties as those prescribed for the offense" that was the object of the conspiracy. As a crime distinct from the object of the offense, conspiracy is proved by demonstrating an agreement or understanding by two or more persons to commit the object offense.

Thus, if the object of the offense is the distribution through a sale of cocaine, as prohibited in 21 U.S.C. § 841(a), a conspiracy to commit the distribution offense must involve an agreement separate from the immediate distribution conduct that is the object of the conspiracy. *See, e.g.*, *Jimenez Recio*, 537 U.S. at 274 (noting that conspiracy and the object of a conspiracy are "distinct evil[s]" (internal quotation marks omitted)); *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011) (holding that proof of a simple buyer-seller relationship is insufficient to prove a drug distribution conspiracy). In this way, "distribution" under § 841 and "conspiracy" under § 846 are distinct crimes. Therefore, when a person sells cocaine to another, he "distributes" the cocaine, in violation of § 841(a). If, however, the transaction includes, *in addition to* the bare agreement inherent in the sale, an agreement that the buyer will resell the cocaine in the marketplace, the two participants to the distribution transaction have also "conspired" to the redistribution of the cocaine, a separate offense, and therefore can be found guilty not only of the distribution offense, in violation of § 841(a), but also of a conspiracy offense, in violation of § 846.

To prove conspiracy, the government need not prove an explicit agreement. It may rely upon indirect evidence from which the conspiracy agreement may be inferred. Thus, we have concluded that the amount of cocaine involved in the distribution transaction, if sufficiently great, may indicate that the parties have engaged in the distribution transaction with an implicit agreement of further redistribution. *See United States v. Yearwood*, 518 F.3d 220, 226 (4th Cir. 2008). We have also concluded that the regularity of individual distribution transactions may indicate the existence of a conspiracy to traffic in cocaine generally and apart from any single transaction. *See United States v. Reid*, 523 F.3d 310, 317 (4th Cir. 2008). Similarly, a transaction involving a consignment arrangement or the "fronting" of drugs indicates conspiracy to engage in drug trafficking beyond the immediate distribution transaction, as the consignment implies a credit agreement that looks to further transactions to secure income to complete the original transaction. *See United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004). Indeed, any agreement made *in addition to or beyond* the bare buy-sell transaction may be taken to infer a joint enterprise between the parties beyond the simple distribution transaction and thereby support a finding of conspiracy. For instance, such agreements might include an agreement that the parties will become regular participants in such transactions; that future transactions will involve particular prices or quantities; or that the parties will assist each other in drug distribution activities involving customers, suppliers, territories, or the preparation of drugs for distribution.

In short, the mere evidence of a simple buy-sell transaction is sufficient to prove a distribution violation under § 841, but not conspiracy under § 846, because the buy-sell agreement, while illegal in itself, is not an agreement to commit an offense; it is the offense of distribution itself. *See Hackley*, 662 F.3d at 679 (noting that "evidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction"). But evidence of any understanding reached as part of the buy-sell transaction that either party will engage

in or assist in further distribution is sufficient to prove both a distribution violation and a conspiracy violation. *See United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993); *United States v. Lechuga*, 994 F.2d 346, 349-50 (7th Cir. 1993) (en banc).

The crime of conspiracy, however, requires a genuine agreement between two or more persons to commit a crime, and an agreement between a defendant and a government agent, who does not agree to commit another crime but is engaging the defendant only to establish evidence of a crime, does not provide evidence of a genuine agreement. *See United States v. Lewis*, 53 F.3d 29, 33 (4th Cir. 1995) ("[A] defendant cannot be convicted for conspiring with a government agent"). Thus, any agreement between the defendant and a government agent cannot form the basis of a conspiracy violation.

In this case, therefore, whatever "agreement" Edmonds and Atkinson might have reached during the controlled purchases does not constitute evidence of conspiracy. But this does not mean that statements made or acts done by Edmonds during the controlled transactions could not be used as evidence of a conspiracy between Edmonds and Atkinson before he was a government agent and between Edmonds and others at any time.

In his pretrial confession, given after being arrested, Edmonds described his dealings and relationship with Atkinson before Atkinson made controlled purchases as a government agent, which indicated a joint enterprise between the two and which were corroborated by trial testimony. Edmonds confessed that, beginning in late 2007, he had sold Atkinson two ounces of crack cocaine on two occasions; one ounce on two occasions; one-half ounce on more than five occasions; and one-quarter ounce on more than five occasions, for a total of over ten ounces of crack (or almost 300 grams). And at trial, Atkinson corroborated these ongoing

transactions, testifying that he purchased half-ounce and full-ounce amounts of crack cocaine from Edmonds prior to the controlled purchases. This course of dealing indicated more than isolated transactions. And the broader arrangement was confirmed by Atkinson's testimony that Edmonds facilitated their course of dealing by teaching Atkinson how to cook powder cocaine into crack cocaine. Edmonds' former girl-friend, Aisha Christian, also confirmed Edmonds' pre-controlled-purchase conduct, testifying at trial that she knew that Edmonds was "making his money from selling drugs."

Edmonds' statements made during the controlled purchases also indicated a prior conspiratorial relationship between him and Atkinson. During the February 6 controlled purchase, when Atkinson expressed concern about whether Edmonds was giving him the 14 grams of crack he had paid for, Edmonds reassured him, "You know me," again implying an ongoing course of dealing. And immediately after that trans-action, Edmonds called Atkinson to say, "I got another one you can get on face," which, as Atkinson explained at trial, referred to a consignment arrangement in which Atkinson would receive the drugs immediately and pay for them later. Indeed, Atkinson testified at trial that he had entered into sim-ilar consignment arrangements with Edmonds prior to the controlled purchases. And during the February 4 controlled purchase, Edmonds told Atkinson that he was "trying to get back to 425" (the price for a half-ounce) and that "if [he] can get to a . . . big eight [one-eighth of a kilogram], [he is] gonna stop cooking it like that [converting cocaine powder to crack cocaine]." During all of the controlled transactions, Edmonds demonstrated a trust in Atkinson as a person with whom he had dealt regularly in the past by revealing his other drug transactions and rejecting Atkinson's offer to be introduced *to a stranger* who would pay "terrible money" for drugs.

In sum, there was ample evidence that, not only did Edmonds know that Atkinson intended to redistribute the drugs he purchased, but Edmonds was part of an ongoing

agreement under which he would regularly act as a supplier for Atkinson's distribution operation. In light of this evidence, we readily conclude that a rational jury could find Edmonds guilty of participating in a conspiracy between him and Atkinson during the period that Atkinson was not making controlled purchases for the government.

### III

In challenging his sentence of 360 months' imprisonment on each of the three distribution counts, Edmonds contends that the district court inadequately considered the sentencing factors contained in 18 U.S.C. § 3553(a). The record, however, belies his claim.

After calculating the appropriate sentencing range under the Sentencing Guidelines, the district court considered Edmonds' childhood background, his health problems, his responsibility to support his two children, his extensive criminal history, his unresponsiveness to "the leniency offered by the state court system," and his "lack of significant employment," which was "indicative of being supported by criminal means." Weighing these considerations and recognizing that Edmonds already faced life imprisonment on the conspiracy count, the court opted for a sentence of 360 months' imprisonment on each distribution count, which was "at the low end of the [Guidelines] range," and imposed those sentences to run concurrently. We cannot conclude that this record supports Edmonds' claim that the court did not adequately consider the § 3553(a) factors in reaching its sentencing decision.

Edmonds also contends that his sentence was improperly enhanced under 21 U.S.C. § 841(b)(1)(A), which provides for a mandatory life sentence for violations of § 841(a) when the defendant has "two or more prior convictions for a felony drug offense," and under U.S.S.G. § 4B1.1(a), which similarly enhances the sentencing range of a defendant who has "two prior felony convictions of . . . a controlled substance

offense." With respect to both the statute and the Guidelines, a qualifying prior felony offense must be punishable by imprisonment for a term exceeding one year. *See* 28 U.S.C. § 802(44); U.S.S.G. § 4B1.2(b). Edmonds concedes that one of his prior convictions, for which he received a sentence of 11-14 months, was punishable by imprisonment for more than one year. But he contends that the North Carolina drug trafficking conviction for which he received a sentence of 9-11 months did not qualify as a predicate offense, citing our decision in *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (en banc). What Edmonds fails to recognize, however, is that the qualification of a prior conviction does not depend on the sentence he actually received but on the maximum sentence that he could have received for his conviction.

With respect to both convictions, Edmonds had, under North Carolina law, a prior record level of IV, and the offense class for both offenses was determined to be Class H. Under the North Carolina sentencing scheme, this record level and class, without any showing of an aggravating factor, subjected Edmonds to a presumptive minimum sentencing range of 9-11 months, *see* N.C. Gen. Stat. § 15A-1340.17(c) (2000), and a maximum sentencing range of 11-14 months, *see id.* § 15A-1340.17(d). *See Simmons*, 649 F.3d at 240. Because 14 months is the maximum that Edmonds presumptively could have received, we conclude that both of Edmonds' convictions were offenses that were "punishable by imprisonment for more than one year" and therefore qualifying felony drug offenses under 21 U.S.C. § 841(b)(1)(A) and U.S.S.G. § 4B1.1(a).

For the reasons given, Edmonds' convictions and sentence are

*AFFIRMED.*