39 F.3d 1262
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dennis HARRIS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Reginald BOONE, a/k/a Reggie, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alfred CALDWELL, a/k/a Big Al, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jeffrey WOODHOUSE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Melvin McLAUGHLIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terrance BRAXTON, a/k/a Dink, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Edward CALLOWAY, a/k/a Stink, Defendant-Appellant.
 Nos. 93-5159 to 93-5165.
 United States Court of Appeals,
Fourth Circuit.
 Nos. 93-5160, 93-5164 and
93-5165 Argued Oct. 28, 1993.
Nos. 93-5159, 93-5161, 93-5162 and 93-5163 Argued Dec. 6, 1993.
 Decided Nov. 4, 1994.
 
 ARGUED: Peter Mark Abramson, Norfolk, VA; Ira Michael Steingold, Virginia Beach, VA; Andrew Robert Sebok, Norfolk, VA; Robert Dean Eisen, Norfolk, VA; Michael Denis Kmetz, Norfolk, VA; W. Thurston Harville, Norfolk, VA; Rodolfo Cejas, II, Norfolk, VA, for appellants. Laura Marie Everhart, Asst. U.S. Atty., Norfolk, VA, for appellee. ON BRIEF: Kenneth E. Melson, U.S. Atty., Norfolk, VA, for appellee.
 Before WIDENER, WILKINSON, and WILLIAMS, Circuit Judges.
 Affirmed in part, vacated and remanded in part by published opinion. Judge WIDENER wrote the opinion in which Judge WILKINSON and Judge WILLIAMS concur.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 Co-defendants Dennis Harris, Reginald Boone, Jeffrey Woodhouse, Melvin McLaughlin, Terrance (Dink) Braxton, Edward (Stink) Calloway, and Alfred Caldwell appeal, asserting numerous trial and sentencing errors. All defendants were convicted of a single conspiracy to distribute or possess with intent to distribute cocaine in violation of 21 U.S.C. Sec. 846 and appeal their convictions based on the claimed insufficiency of the evidence to support this conviction of a single drug conspiracy or any conspiracy at all. All defendants assign reversible error to the district court's failure to grant a mistrial or limit jury consideration of the testimony of witnesses who had spoken to other witnesses prior to testifying and the admission into evidence of a summary of telephone records. In addition, Boone appeals the district court's denial of his motion to suppress evidence and his convictions of two counts of using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. Sec. 924(c)(1). All the defendants challenge the calculation of their sentences under the Guidelines, as well as the constitutionality of the Sentencing Guidelines' base offense levels for crack cocaine because of the disproportionate impact on blacks. We affirm the convictions and the sentences, with the exception of Boone's life sentence imposed pursuant to 21 U.S.C. Sec. 841(b)(1)(A).
 
 
 2
 We review the facts of this conspiracy in the light most favorable to the government, including all reasonable inferences. See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Russell, 971 F.2d 1098, 1109 (4th Cir.1992), cert. denied --- U.S. ----, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993).[1] The evidence supported proof of a large cocaine distribution network operating to supply the Norfolk area, with Harris and Vincent (Jack) Goodson receiving large amounts of cocaine from their suppliers, and converting a large amount of this cocaine to its base form (crack) and then selling the crack in smaller quantities, from a gram to an ounce, to Dudley White; Boone; Woodhouse; Tyrone Boone, Reginald Boone's brother; and others, who retailed the cocaine to their customers, including street-level buyers for personal consumption.
 
 
 3
 As far back as 1986 and continuing until 1992, Harris and Goodson sold half-ounces of cocaine about three times a week to Dudley White, a customer from North Carolina. White, after contacting Goodson or Harris, obtained cocaine from them or McLaughlin, Caldwell, or Miss Tompkins. Besides sharing customers like White, Harris and Goodson shared the use of several cocaine distribution houses. McLaughlin was the houseman at these locations; that is, he would handle drug customers or call Harris or Goodson if necessary. In addition, Harris distributed cocaine out of his barbershop, Z & D Blademasters on East Princess Anne Road in Norfolk, using his employees Caldwell, McLaughlin, Calloway, and Brandon (Putt) Thatch. Harris was one of the major suppliers of cocaine to Boone, Tyrone Boone, and Woodhouse, who distributed the drug in the Brambleton area of Norfolk.
 
 
 4
 One of these drug distribution houses run by Harris and Goodson was located in Virginia Beach, Virginia (Stoney Point) and operated from October 1990 until September 1991. Calloway leased the apartment and paid the rent to the landlord, while McLaughlin lived there. However, Harris and Goodson actually paid the rent and other bills. Both Harris and Goodson used the apartment to prepare cocaine, while Harris, Goodson, McLaughlin, and Calloway distributed cocaine from Stoney Point. Harris picked up from McLaughlin any money from drug sales at Stoney Point. Harris and Goodson stored the cocaine in a locked closet and McLaughlin had one of the keys.
 
 
 5
 Large amounts of cocaine were distributed from this location to White who would resell it. Anthony Robertson supplied Goodson with cocaine at Stoney Point, beginning with four and one-half ounce deliveries and increasing to two kilograms at a time. Goodson and Harris split these deliveries 50-50. Each day, ounces of cocaine, both in powder and crack form, were prepared for resale. White purchased quantities from a half-ounce to two ounces at a time, three times a week from either Harris or McLaughlin at Stoney Point. He saw a half a kilogram of cocaine at Stoney Point, in the presence of Goodson, McLaughlin, and Braxton.
 
 
 6
 Brandon Thatch, who worked at Harris's barbershop, was one of the smaller dealers utilized by Harris to distribute his cocaine. Harris approached Thatch and asked if he knew anyone who wanted to buy cocaine and, after locating customers, Thatch would pick up the drug from McLaughlin at Harris's instructions. Thatch continued to contact Harris for cocaine, each time getting it at Stoney Point from McLaughlin, Harris, or Calloway or from Calloway at the barbershop. Harris would give Thatch the drugs, who would sell them, give Harris the money, and Harris would give him $20 or $50.
 
 
 7
 In September of 1991, Harris, Goodson, McLaughlin, and Calloway, assisted by Thatch, moved their operation from Stoney Point and set up operations in an apartment on Kingston Avenue in Norfolk. Once again, Calloway leased the apartment and contracted for telephone service, and McLaughlin lived there as houseman for Harris and Goodson, along with Miss Tompkins, Braxton and sometimes Calloway. Harris and Goodson also paid the bills at Kingston. Harris continued to be at this distribution house every day or two to prepare, package, and sell cocaine, and to pick up drug sale money from McLaughlin, who sometimes cooked the cocaine powder into crack when Harris was too busy. Approximately an ounce or more a day was converted to crack at the Kingston residence. Harris and Goodson directed the drug operation at this location with Harris, Goodson, McLaughlin, Calloway, Braxton, and Caldwell selling or distributing the cocaine. At first the cocaine was stored in a locked closet with McLaughlin having the key, but later Goodson bought a safe for the money and drugs and Goodson, Harris, and McLaughlin had the combination. White saw a half a kilogram of cocaine in the safe in the presence of McLaughlin and Braxton. Miss Tompkins said Goodson and Harris got their cocaine from a seller who came from New Jersey once or twice a week with about a half-gallon bag of cocaine. Miss Tompkins also sold cocaine from the apartment, and one time sold a half-ounce of Harris's crack cocaine to Tyrone Boone at Harris's request and gave the money to Harris. Calloway would occasionally deliver some of Harris's cocaine to Miss Tompkins. Both Caldwell and Calloway used Harris's car to drive McLaughlin around to make drug deliveries, because McLaughlin couldn't drive. Thatch obtained cocaine from Harris and McLaughlin at Kingston, as well as from both at the barbershop.
 
 
 8
 On September 18, 1991, Miss Tompkins moved from the Kingston apartment to a nearby apartment on Baychester Avenue. The lease and telephone were in her name, but Harris paid the rent. McLaughlin remained at the Kingston apartment and continued to distribute drugs. Harris and Goodson used this apartment to prepare cocaine. Goodson installed a keyed bolt lock on the door of one bedroom and drugs were kept in this room. Calloway obtained cocaine at Baychester from Harris and McLaughlin and distributed cocaine from that location. Dudley White obtained cocaine from Harris at Baychester, and Miss Tompkins delivered crack from Harris to White. Thatch purchased cocaine from Harris and McLaughlin at Baychester and then resold it.
 
 
 9
 On January 1, 1992, McLaughlin leased an apartment on Honaker Avenue in Norfolk, with telephone service in Calloway's name. Braxton contracted for pager service on January 6, 1992, giving the Honaker address. Harris, Goodson, McLaughlin, and Braxton distributed cocaine from this residence, with Braxton acting as houseman. White continued his cocaine purchases from Goodson and Harris here by calling Braxton, who would page either Harris or Goodson. Sometimes there was a half a kilogram of cocaine in the safe at Honaker, and McLaughlin and Braxton were aware of that.
 
 
 10
 Reginald Boone, Tyrone Boone, and Jeffrey Woodhouse also distributed cocaine in the Norfolk area, obtaining much of their supply from Harris, as well as Clarence Lindsey until Lindsey was arrested in October of 1991. As early as July of 1989, T. Boone and Woodhouse obtained half-ounce quantities of cocaine from Harris about every two weeks, which they split. After Harris opened the barbershop, T. Boone obtained cocaine there from McLaughlin or Stink Calloway. Reginald Boone was one of Harris's regular customers at Stoney Point. Around September of 1991, Boone got half-ounce quantities of cocaine from Harris, which he and T. Boone sold in the Brambleton area. Harris directed T. Boone to the Kingston house to purchase cocaine, where he obtained it once from McLaughlin and twice from Miss Tompkins. Boone sold cocaine on Princess Anne Road.
 
 
 11
 On September 21, 1991, Woodhouse rented an apartment on Edward St. in Norfolk and Boone, T. Boone, and Woodhouse sold cocaine and cocaine base from this location. Miss Tompkins and a friend, Karen Blackwell, bought cocaine from Boone, who took it out of a safe containing fifty to sixty $20.00 bags of crack cocaine. During this time, Boone was seen several times with Miss Tompkins or Harris and was seen at the Kingston apartment once or twice a week. Boone came by Kingston frequently to purchase cocaine, sold some to Karen Blackwell at Harris's Baychester apartment, and sometimes delivered drugs obtained at Kingston to Miss Tompkins at Baychester.
 
 
 12
 This particular Norfolk drug distribution network began to disintegrate starting on December 12, 1991, when the Norfolk Police Department executed a search warrant at the Edward Street apartment of Boone, T. Boone, and Woodhouse. The police recovered a safe that was in Boone's bedroom, two shotguns which were in a closet in his bedroom, and various amounts of cocaine and cocaine base. The police arrested Boone just prior to the search of the apartment, after he drove away, and arrested T. Boone and Woodhouse after the search.
 
 
 13
 Brandon Thatch, an employee at Harris's barbershop who frequently bought or dealt cocaine obtained from Harris's group, was apprehended on February 25, 1992 after he sold cocaine obtained from Harris in a series of undercover drug buys set up by the Norfolk City Police. Dudley White was arrested in North Carolina on March 13, 1992. White had contacted Harris earlier that day to purchase cocaine, and Caldwell delivered it as McLaughlin and Braxton waited nearby. White agreed to cooperate with the Norfolk police in making controlled drug buys from Harris's organization. On March 14th, 1992, White paged Harris, who called him back and they arranged a one-half-ounce cocaine sale, with Caldwell making the actual delivery. White made a similar drug buy on March 16, 1992, again contacting Harris, but Miss Tompkins made the actual delivery. On March 17, 1992, again after telephoning Harris, White went to Baychester to buy three ounces of crack cocaine. McLaughlin answered the door, Caldwell handed White the drugs, and McLaughlin weighed them on the scale. Finding that the weight was less than three ounces, McLaughlin gave the drugs back to Caldwell, and McLaughlin and White used a pay phone to inform Harris about the weight problem. After assuring White that McLaughlin would "make it right," White left while McLaughlin returned to the Baychester apartment. White gave a signal to the police, who searched the Baychester apartment and found 3 and 1/2 to four ounces of crack and powder cocaine under Miss Tompkins' mattress in a sock. Harris had just left the apartment and he was known to keep his drugs in socks. After the search, Miss Tompkins, McLaughlin, and Caldwell were arrested.
 
 
 14
 Finally, Harris was arrested on July 9, 1992, after a series of controlled drug buys by a government informant. Pursuant to the arrest, the police searched Harris and his vehicle and recovered cocaine, some stored in a sock.
 
 I.
 
 15
 The defendants admit that Harris had all his co-defendants "deliver cocaine or otherwise engage in the distribution of cocaine for him," Def.Brf. p. 3-4, yet they still contend that the evidence showed two conspiracies, rather than the single conspiracy charged in the indictment, and that there was insufficient evidence to support any agreement to be a part of this conspiracy. Although these two issues are conceptually distinct, the evidence supporting a conclusion of a single conspiracy and an agreement to join that conspiracy is intertwined and they can be considered in a unified fashion. See United States v. Banks, 10 F.3d 1044, 1051 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1850, 128 L.Ed.2d 475 (1994).
 
 
 16
 Whether there is a single conspiracy or multiple conspiracies, as well as an agreement to participate in the conspiracy, is a question of fact for the jury and we must affirm its finding of a single conspiracy "unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury so to find." United States v. Urbanik, 801 F.2d 692, 695 (4th Cir.1986). The jury in this case was instructed on the law of conspiracy and as well if they did not find the single conspiracy charged in the indictment they must acquit.
 
 
 17
 In United States v. Banks, 10 F.3d at 1054, we held that the fact that parallel suppliers, or middlemen, or street dealers serving such a market may sometimes, or even always, compete for supplies or customers in serving that market does not on that account alone disprove either the existence of a single conspiracy to achieve the overall results of their several efforts, or the participation of particular ones of them in that conspiracy.
 
 
 18
 The requisite proof of a conspiracy is usually shown by circumstantial evidence, United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991), and often can be inferred from the totality of circumstances shown by the Government, United States v. Mabry, 953 F.2d 127, 130 (4th Cir.1991) (citation omitted), cert. denied, --- U.S. ----, 112 S.Ct. 1951, 118 L.Ed.2d 555 (1992). We are of opinion that substantial evidence, including reasonable inferences in favor of the government, supports the jury's determination of a single conspiracy and each defendant's agreement and participation in that conspiracy. Boone, T. Boone, and Woodhouse regularly purchased cocaine from Harris and his subordinates for resale to their own customers. Thus, according to Banks, there was evidence which tended to show they knew of the illegal efforts of Harris and his group in supplying them with cocaine and they took this drug supply and distributed it to the drug market in their area. It is often such smaller drug retailing activities that a conspiracy depends on for its success and, as such, the Boone operation was an integral part of the Harris conspiracy to distribute cocaine in the Norfolk area. We think the evidence we have related in the first eleven pages of this opinion supports the jury's finding of one conspiracy as we so hold.
 
 II.
 
 19
 The defendants claim reversible error because government witnesses Clarence Lindsey and Albert Robertson, prior to their own testimony, discussed the case with another government witness, Tracy Chapman, after Chapman had testified, and cite United States v. Farnham, 791 F.2d 331 (4th Cir.1986), in support of the conclusion that they need not show that they were prejudiced by this violation of the sequestration order in order to obtain a reversal. In Farnham, however, we held that violations of Fed.R.Evid. 615 are subject to the harmless error rule, even though we were willing to, in effect, presume prejudice where the district court clearly violated the rule by allowing both testifying government agents to remain in court during each other's testimony and where it would be impossible for the defendant to prove that the second agent's testimony would have been different if he had not heard the first agent's testimony. Farnham, 791 F.2d at 335. We have no need to presume prejudice to the defendants here because we are satisfied in the case before us that the discussions that took place between the witnesses had no substantial influence on the jury verdict, Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), because the substance of any testimony was not discussed. In conclusion, since those witnesses did not relate the substance of their testimony to another witness, we are of opinion that Farnham is not applicable to this case, and the error, if any, was harmless.
 
 III.
 
 20
 The defendants challenge the admission into evidence of a summary, prepared by government investigator Thomas Reason, Jr. from telephone and pager records already in evidence, which showed the extent of calls between the defendants and individuals who purchased drugs from the Harris drug distribution network. The defendants claim this summary, admitted pursuant to Fed.R.Evid. 1006,[2] is inadmissible because there was no evidence that Investigator Reason prepared the summary himself and the documents that formed the basis for the summary were not admitted into evidence. This argument is entirely without merit and a review of the trial record clearly shows that Investigator Reason prepared the summary himself from previously admitted government exhibits consisting of telephone and pager records that he identified as the ones he used to make the summary.
 
 IV.
 
 21
 Captain Robert E. Walsh was told by a confidential informant, who had previously provided information that had led to five drug arrests, that the informant had recently been inside Boone's apartment on Edward St., had seen two safes being used to store cocaine and money, and Boone and Woodhouse were distributing cocaine from the apartment. The Norfolk police started surveillance on the residence, while they began the process of obtaining a search warrant. The informant indicated within the hour that Reginald Boone would be leaving the residence and, based on conversations taking place and because Reginald Boone had delivered drugs before, using the vehicle parked at the residence, he was about to make a drug delivery. While the police were awaiting the search warrant, they observed Boone leave the residence and drive off in his vehicle. The police stopped the vehicle, and while one police officer removed Boone, another went up to the car and observed, in plain view, white powder on the carpet on the passenger side. Suspecting that this powder was cocaine, the officers arrested Boone and in the process of searching the vehicle incident to the arrest found a set of electronic scales under the passenger seat that also contained white powdery residue.[3]
 
 
 22
 The district court denied Boone's motion to suppress, finding that the police had reasonable suspicion of illegal activity, as well as probable cause based on the known fact that Boone was driving on a suspended license. Boone asserts that the stop of his vehicle was the equivalent of an arrest, since Boone was not free to leave, and the police lacked probable cause to make this arrest. We review de novo a district court's legal conclusion that an investigatory stop is based on reasonable suspicions. See United States v. Rusher, 966 F.2d 868, 873 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).
 
 
 23
 The defendants are mistaken in characterizing this vehicular stop as an arrest. We have held that a "brief but complete restriction of liberty is valid under Terry," United States v. Moore, 817 F.2d 1105, 1108 (4th Cir.), cert. denied, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987), and such an investigatory stop of a vehicle can be justified on a reasonable suspicion of illegal activity instead of probable cause. See, e.g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Alabama v. White, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990).
 
 
 24
 We are of opinion that the stop of Boone's vehicle was a proper investigatory stop based on reasonable suspicion. Such a stop does not violate the Fourth Amendment where the police have a "particularized and objective basis for suspecting the particular person stopped of criminal activity," United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The Norfolk police had the recent information of a known reliable informant that Boone was selling drugs from Edward Street, used the specific vehicle to make drug deliveries, and was about to leave to make a drug delivery. Information of criminal activity given by a known reliable informant is enough to sustain a Terry stop. See Alabama v. White, 496 U.S. 325, 328, 110 S.Ct. 2412, 2415, 110 L.Ed.2d 301 (1990) (construing the holding of Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)).[4]
 
 V.
 
 25
 On November 13, 1991, Boone supplied Napoleon Yarn with the purchase money to buy him a shotgun and Boone gave him approximately $30.00 worth of crack cocaine in payment for getting this shotgun for him. Boone contends that his exchange or barter of cocaine for his service in obtaining the shotgun is not an offense punishable by 18 U.S.C. Sec. 924(c)(1), which criminalizes using or carrying a firearm during and in relation to a drug trafficking offense. The Supreme Court rejected a similar contention in Smith v. United States, --- U.S. ----, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (holding that the exchange of a gun for narcotics constitutes a violation of 18 U.S.C. Sec. 924(c)(1)). We think Smith is persuasive and hold the argument is without merit.
 
 
 26
 Boone also challenges his other section 924(c) conviction, which was based on the two shotguns found in a closet in his bedroom along with various amounts of cocaine and cocaine base during the search on December 12, 1991. Boone argues that there can be no "use" within the meaning of section 924(c)(1), when Boone was not arrested in the same location as the guns. This argument has no merit. "Determining whether an adequate connection has been made between a firearm and an underlying drug offense is a classic jury question." United States v. Kimberlin, et al., 18 F.3d 1156, 1158 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 131, 130 L.Ed.2d 74 (1994). We do not find that the fact that Boone was arrested outside the apartment in which the guns were stored warrants a contrary conclusion. See United States v. Nelson, 6 F.3d 1049 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994), Boone was convicted of possession with intent to distribute both cocaine and cocaine base on December 12, 1992, and there was sufficient evidence on which a jury could conclude that the guns stored nearby in the closet were present for protection and to facilitate the likelihood of the success of the drug distributions that Boone intended.
 
 VI.
 
 27
 The defendants challenge the constitutionality of the Sentencing Guidelines' base offense levels for crack cocaine because of their disproportionate impact on blacks. We have rejected this argument in United States v. Bynum, 3 F.3d 769, 774-75 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994), and adhere to that decision.
 
 VII.
 
 28
 The defendants maintain that the amount of drugs used in calculating their base offense levels was erroneous, because the drugs attributed to what they call the Harris group and those attributed to what they call the Boone group should not have been used in calculating each other's sentences, and the district court attributed to the defendants almost all of the amounts of cocaine and crack that was testified to, despite the lack of veracity of the witnesses.[5] The defendants, however, give no specific examples of where the district court calculated drug amounts for the Harris group using drug amounts distributed or bought solely by the Boone group, or vice-versa. Using a clearly erroneous standard of review, United States v. Daughtrey, 874 F.2d 213 (4th Cir.1989), we find no error.[6]
 
 VIII.
 
 29
 Harris claims the district court erred in enhancing his sentence pursuant to U.S.S.G. Sec. 3B1.1(a),[7] because the district court should have made a factual finding that Harris controlled four other persons in the conspiracy, and because it did not, Harris should be resentenced. A district court's determination of a defendant's role in the offense is a factual determination reviewable under the clearly erroneous standard. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989).
 
 
 30
 While control is an important factor, it is only one of several that a sentencing court considers when applying a section 3B1.1(a) enhancement. Application note 3 to the 1992 Sentencing Guidelines lists seven factors that a court may consider when determining a defendant's organizer or leadership role, only one of which is "the degree of control and authority exercised over others." The district court heard argument on Harris's involvement in the conspiracy, including his control over others, added Miss Tompkins in the calculation of the number of persons involved in the criminal activity, found that Harris's aggravating role was supported by overwhelming evidence, and justified the enhancement because Harris recruited other people into the conspiracy. Such recruitment is one of the factors to be considered according to Application note 3. We find no clear error in the district court's finding that Harris merited the role in the offense enhancement, even though it did not distinctly articulate any factors in addition to Harris's recruitment activities.
 
 IX.
 
 31
 The district court indicated that it would not impose a life sentence on Harris, because of his Criminal History Category I and the lack of violence in the offense, had the Guidelines not compelled it to do so. Harris now argues that the court had such authority to make a downward departure. Our review in such cases is de novo. United States v. Fonville, 5 F.3d 781, 783 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1839, 128 L.Ed.2d 466 (1994).
 
 
 32
 The district court must impose the Guidelines sentence unless it determines that "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. Sec. 3553(b). The Guidelines authorize downward departures where a defendant's criminal history category over-represents the seriousness of a defendant's criminal history, but specifically rejects departures below Category I: "... a departure below the lower limit of the guideline range for Criminal History Category I on the basis of adequacy of criminal history cannot be appropriate." U.S.S.G. Sec. 4A1.3. Thus, we are of opinion that the Commission has adequately considered and rejected departures below Criminal History Category I based on lack of criminal history.
 
 
 33
 As for the lack of violence in the offense, most of the guidelines base offense levels are predicated on an absence of violence, with guidelines specifically allowing for upward adjustments above the authorized guideline range if the offense results in physical injury or a weapon is used. Therefore, the Commission has adequately considered lack of violence within the scheme of the authorized guideline ranges with a general upward departure authority for violence. So a downward departure for lack of violence is not justified. See U.S.S.G. Secs. 5K2.0, 5K2.1, 5K2.2, 5K2.4, 5K2.6.
 
 X.
 
 34
 Because the defendant had been "convicted of a conspiracy found by the jury to involve more than the statutory amounts," the district court applied the enhanced sentencing provisions of 21 U.S.C. Sec. 841(b)(1)(A) and sentenced Boone to a mandatory minimum of life on Counts One and Thirty-three.[8] For the purpose of determining his base offense level under the Sentencing Guidelines, the district court attributed to Boone 4.23 kilograms of powder cocaine and 9.24 grams of cocaine base, neither of which, individually, meet the minimum drug amounts of section 841(b)(1)(A). However, the district court, utilizing the drug conversion tables of U.S.S.G. Sec. 2D1.1, comment (n.2), aggregated the 4.23 kilograms of cocaine and 9.24 grams of cocaine base under U.S.S.G. Sec. 2D1.1, comment (n. 6) and arrived at a total amount of 52 grams of cocaine base. On this basis the district court invoked the mandatory life provision of section 841(b)(1)(A) and sentenced Boone accordingly. Boone appeals this sentence, claiming that the district court erred in applying the mandatory minimum of section 841(b)(1)(A) based on such aggregation of drug amounts.
 
 
 35
 Subsequent to Boone's sentencing, we decided United States v. Irvin, 2 F.3d 72, 73, 77 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994), in which we held that a district court must first "determine the quantity of narcotics reasonably foreseeable to each individual coconspirator prior to a determination of the applicability of the mandatory minimum sentence provisions of Sec. 841(b)" and that the method of doing so is under the relevant conduct guideline, U.S.S.G. Sec. 1B1.3. Irvin noted, however, that while aggregation may be sometimes required under the Sentencing Guidelines, "Sec. 841(b) provides no mechanism for aggregating quantities of different controlled substances to yield a total amount of narcotics," Irvin, 2 F.3d at 76, n. 5.
 
 
 36
 The sentences running concurrently, we are satisfied that the district court took into account both the amounts of cocaine and cocaine base involved in Counts One and Thirty-three to arrive at its finding of 4.23 kilograms of powder cocaine and 9.24 grams of cocaine base. The difficulty is that the district court aggregated the quantities of "different controlled substances" involved to arrive at 52 grams of cocaine base. As we have pointed out, it did not have the benefit of Irvin when it sentenced, and so its sentence must be vacated. The sentences of the district court of life imprisonment for Counts One and Thirty-three, to run concurrently with each other, are accordingly vacated and the case is remanded for re-sentencing.
 
 
 37
 Without disturbing the findings of the district court, that Boone should have attributed to him 4.23 kilograms of cocaine and 9.24 grams of cocaine base in view of Irvin, the aggregation of the quantities of drugs to arrive at 52 grams of cocaine base was in error, as we have pointed out, and Boone should have been sentenced under Sec. 841(b)(1)(B) rather than Sec. 841(b)(1)(A). While the matter is not directly before us, we note that if Boone is a convicted felon, as defined in Sec. 841(b)(1)(B), his sentence would be not less than ten years nor more than life imprisonment unless death or serious bodily injury resulted, in which event the sentence of life imprisonment would be mandatory. If Boone is a career offender under Sentencing Guideline Sec. 4B1.1, and since the statutory maximum sentence is life imprisonment, the offense level would probably be 37, and the sentencing range from the sentencing table would be 360 months to life imprisonment. The above computation is undertaken as an explication of our reasoning in vacating Boone's sentences, as mentioned just above, rather than as a limit on any discretion of the district court granted under the Sentencing Guidelines.
 
 
 38
 We note that Boone received thirteen different sentences of imprisonment in this case, various ones of them to run concurrently or consecutively with other sentences. Because of the resentencing on Counts One and Thirty-three, which we have ordered just above, all of the balance of Boone's sentences of any kind in this case are vacated and remanded for resentencing. We do this because resentencing on Counts One and Thirty-three may well make appropriate the adjustment of all the rest of his sentences involved in this case.
 
 XI.
 
 39
 Boone appeals the district court's assessment of two consecutive sentences of five years and twenty years respectively for his convictions of Counts Twenty-seven and Thirty-six, both violations of 18 U.S.C. Sec. 924(c)(1), on the basis that the only underlying drug trafficking offense was the conspiracy charge and that multiple Sec. 924(c) convictions require distinct underlying drug trafficking offenses. We agree with the government that the conspiracy count was not the underlying drug trafficking offense on which these Sec. 924(c) convictions were predicated. Count Twenty-seven charged Boone with a violation of Sec. 924(c) for giving Napoleon Yarn $30.00 worth of cocaine for buying a shotgun for him and Count Twenty-five charged Boone with the substantive offense of distributing this cocaine to Yarn. Count Thirty-six charged Boone with a violation of Sec. 924(c) for the two shotguns found in his closet during the search of December 12, 1991 and Count Thirty-three charged Boone with possession with intent to distribute the cocaine base that was found near the guns the day of the search. Therefore, the district court properly sentenced Boone to consecutive terms of five years for the first violation of Sec. 924(c) and twenty years for the second violation of Sec. 924(c). See Deal v. United States, --- U.S. ----, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).
 
 
 40
 These seven defendants-appellants have appealed on 14 grounds, some or all of which apply to some or all of the defendants.
 
 
 41
 We have addressed in enough detail all of these assignments of error we think worthy of mention. We have considered all the assignments of error, however, and are of opinion all of them are without merit with the sole exception of the life sentence imposed on Boone.
 
 
 42
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.*
 
 
 
 [1]
 Other facts are recounted elsewhere in relation to certain discrete issues
 
 
 [2]
 Fed.R.Evid. 1006 states:
 The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.
 
 
 [3]
 Later testing identified the scale residue as cocaine, but initial tests of the carpet were negative and a sufficient amount of powder for laboratory testing could not be recovered
 
 
 [4]
 The government also relies on the district court's determination that the police had probable cause to stop and arrest Boone because the police knew he was driving on a suspended license. In view of our holding regarding reasonable suspicion, we need not address this alternative justification for the stop
 
 
 [5]
 Credibility determinations are within the province of the trial court and we decline to address this unsubstantiated claim that witnesses, never identified in the defendants' brief, were not credible
 
 
 [6]
 The sentencing documents, including transcripts of the sentencing hearings, pre-sentence reports, and associated district court Memoranda and Statement of Reasons, comprise over 900 pages of the joint appendix in this case. Such vague claims of drug amount calculation errors, unaccompanied by concrete examples and citations to the appendix, seriously impede appellate review of such claims. As well, they do not add to the persuasiveness of the claims
 
 
 [7]
 Sec. 3B1.1(a) prescribes a four-level increase in offense level "if the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."
 
 
 [8]
 Count One, a violation of 21 U.S.C. Sec. 846, was charged in the indictment as a conspiracy to distribute or possess with intent to distribute in excess of five kilograms of cocaine and 50 grams of cocaine base, in violation of 21 U.S.C. Sec. 841(a)(1), and Count Thirty-three, was charged in the indictment as possession with intent to distribute 8.16 grams of cocaine base on December 12, 1991, a violation of 21 U.S.C. Sec. 841(a)(1). The sentences on Counts One and Thirty-three ran concurrently
 
 
 *
 Boone's motion, filed August 29, 1994, that his attorney "produce [for him] all documents and transcripts pertaining to" this case is denied
 The motion of Caldwell that he be permitted to amend the brief submitted by his attorney is denied. However, the paper filed by Caldwell August 12, 1994 entitled "Amended Supplement Appellate Brief" is accepted for consideration.