**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

FRANK DEMETRIC DICKERSON, JR.,

*Defendant-Appellant.*

No. 01-4416

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CR-97-410-L)

Argued: May 9, 2002

Decided: June 28, 2002

Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.

Affirmed by unpublished opinion. Judge Niemeyer wrote the opinion,
in which Judge Widener and Judge Gregory joined.

## COUNSEL

**ARGUED:** Kenneth Wendell Ravenell, SCHULMAN, TREEM,
KAMINKOW, GILDEN & RAVENELL, P.A., Baltimore, Maryland,
for Appellant. Christine Manuelian, Assistant United States Attorney,
Baltimore, Maryland, for Appellee. **ON BRIEF:** Thomas M.
DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

NIEMEYER, Circuit Judge:

Frank Dickerson was convicted of conspiracy to traffic in at least 5 kilograms of cocaine and 50 grams of cocaine base during the period 1992 through November 21, 1997, and possession with intent to distribute at least 500 grams of cocaine on November 21, 1997, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The district court sentenced Dickerson to 360 months imprisonment.

On appeal, Dickerson contends that the conspiracy charged in this case was the same conspiracy for which he was earlier charged and convicted in Florida and for which he is currently serving a sentence of 240 months imprisonment. Accordingly, he contends that his conviction violates the Double Jeopardy Clause. Alternatively, he argues that he was involved in multiple conspiracies for which he could not be tried on the indictment which charges one conspiracy for the period 1992 through 1997. Dickerson also contends that the prosecutor engaged in misconduct, that the district court improperly admitted hearsay evidence, and that his sentence violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

For the reasons that follow, we affirm.

I

Throughout the period from 1988 through 1997, Dickerson was a cocaine distributor, working mainly on the Eastern Shore of Maryland. From 1988 until 1990, he was supplied with cocaine by Albert Nelson in Florida, and Nelson was, in turn, supplied by Vincente Rodriguez. After Nelson was arrested in 1990, James Hanks, who also lived in Florida, took over this arrangement as supplier to Dickerson. This arrangement continued until October 1991, when Hanks died. On one occasion during the period that Hanks supplied Dicker-

son, in late 1990 or early 1991, Guillermo Alfonso supplied Hanks with 15 kilograms of cocaine.

Richard Williams acted as a courier between Nelson and Dickerson, but he also delivered drugs to John Bonds in Chicago and to Robert Randall in Atlanta. Mark Sears operated a "stash house" in Miami, Florida for the conspiracy. For his part, Dickerson resold the drugs on the Eastern Shore to low-level dealers, such as Troy Perkins. Richard Blanks worked as a courier for Dickerson beginning in 1988.

In 1996, Dickerson, together with Nelson, Randall, Bonds, and Williams, was indicted in Florida of conspiracy to distribute cocaine for the period from 1988 to 1991. Dickerson was convicted as charged and sentenced to 20 years imprisonment, and this conviction was affirmed on appeal. *United States v. Dickerson*, 248 F.3d 1036 (11th Cir. 2001). The government refers to this conspiracy as the "Florida conspiracy."

After Hanks died in late 1991, Dickerson continued his cocaine distribution business in Maryland by using different suppliers. This part of Dickerson's drug distribution activities, which the government refers to as the "Maryland conspiracy," began with Sears' supplying Dickerson with cocaine. Sears, who lived in Florida, used Henry Nathan Johnson as a courier to deliver cocaine to Dickerson, until Johnson was arrested in November 1993, when he was stopped by law enforcement officers on his way to Baltimore to deliver cocaine to Dickerson. Three kilograms of cocaine were seized from him. In January 1994, Dickerson himself traveled to Florida to pick up three kilograms of cocaine from Sears for distribution in Maryland. Like Nelson in the "Florida conspiracy," Sears in the "Maryland conspiracy" was supplied by Rodriguez.

After Sears stopped supplying Dickerson in early 1994, Dickerson turned to Guillermo Alfonso whom Dickerson had met in 1993 through Randall. In early 1994, Alfonso was a fugitive in Mexico. Dickerson and Randall sent Alfonso false identification in Mexico so that Alfonso could return to the United States and supply both Dickerson and Randall with cocaine for their respective operations. Between the end of 1995 and the end of 1997, Alfonso testified that he supplied Dickerson with 30 to 50 kilograms of cocaine every one-and-a-

half to two months, and he supplied him with a final shipment in November 1997 of 75 kilograms. During this period one of Dickerson's couriers, Robert Jackson, was caught by law enforcement officers with nine kilograms of cocaine stashed in Dickerson's Cadillac El Dorado.

Alfonso used several couriers, including Gary Fox, who corroborated Alfonso's testimony about his cocaine supply arrangement with Dickerson. Fox made 12 to 15 trips to Baltimore, Maryland, to deliver cocaine to Dickerson. He was paid $500 per kilogram of cocaine transported and $10,000 each time he transported cash from Dickerson to Alfonso. This arrangement continued until November 1997, when Dickerson was arrested.

Alfonso also used Jennifer Kumpf and her husband William Kumpf as couriers. The Kumpfs would pick up money from Dickerson in Baltimore to take to Alfonso in California, transporting anywhere from $30,000 to $80,000 at a time. Jennifer Kumpf made five to ten trips in total, and William Kumpf made six trips in total. Alfonso paid the Kumpfs between $500 and $3,000 per trip.

In addition to Sears and Alfonso, Dickerson obtained cocaine for his Maryland conspiracy from an unnamed individual in New York.

Dickerson sold his cocaine to Troy Perkins and Richard Blanks. Perkins bought cocaine from Dickerson during the period from 1990 or 1991 until 1994 to resell it to drug users. He estimated that he purchased approximately 100 kilograms of cocaine from Dickerson during this period. With Dickerson's knowledge, Perkins generally converted the cocaine to crack. Perkins also bought cocaine from Jimmy Jones, whom Dickerson also supplied. Perkins eventually became a government informant.

Blanks bought cocaine from Dickerson during the period between 1992 and 1997 in amounts ranging from a few ounces to a kilogram each time. Blanks also acted as a courier between Dickerson and Perkins. He would resell the cocaine to drug users and converted some of the cocaine to crack, again with Dickerson's knowledge. Blanks was arrested in 1997 for possession of 500 grams of cocaine, and after his arrest, he began working undercover for the police, making tape

recordings of conversations. While working undercover, Blanks purchased a kilogram of cocaine from Dickerson in August 1997 and again in October 1997. Finally, on November 21, 1997, Blanks made a controlled buy from Dickerson, which led to Dickerson's arrest.

In response to the superseding indictment filed against Dickerson in this case, Dickerson moved to dismiss the indictment based on double jeopardy. He contended that the conspiracy charged in the indictment was the same as the "Florida conspiracy" for which he had already been tried and convicted. Following a hearing in April 1999, the district court denied Dickerson's motion, and, on interlocutory appeal, we affirmed. *United States v. Dickerson*, No. 99-4259, 2000 WL 135112 (4th Cir. Feb. 7, 2000).

The government's third superseding indictment, which was filed after we last reviewed this case and on which Dickerson was convicted, charged Dickerson in three counts with (1) conspiracy to possess 5 kilograms or more of cocaine and 50 grams of crack cocaine between 1992 and November 21, 1997; (2) distribution of 500 grams or more of cocaine on December 28, 1996; and (3) possession with intent to distribute 500 grams or more of cocaine on November 21, 1997. After a five-week trial, the jury convicted Dickerson on Counts 1 and 3. The district court sentenced Dickerson to 360 months imprisonment on Count 1 and 120 months imprisonment on Count 3, to be served concurrently. This appeal followed.

II

Dickerson contends first that his conviction in this case of the "Maryland conspiracy" violates the Double Jeopardy Clause of the Fifth Amendment.* He asserts that the evidence presented at trial makes it "evident that the Maryland conspiracy charged is an attempt to reprosecute [him] for an offense for which he has already been convicted in Florida," namely the "Florida conspiracy."

---

*The clause provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

Dickerson raised this double jeopardy defense in the earlier inter-locutory appeal. In rejecting it, we pointed out that although there were "common players" between the Florida and Maryland conspira-cies, *Dickerson*, 2000 WL 135112, at *2, this overlap did not make the two conspiracies actually one. Rather, the "more accurate method for determining whether one or two conspiracies exist is to consider the principal players . . . [which] generally include the suppliers, con-tacts and buyers." *Id*. at *7. Thus, because the "shared comrades of the conspiracies," referring to Sears, Blanks, and Johnson, "were not the principal participants," and because of other differences pointing to two conspiracies, there was no double jeopardy violation. *Id*.

But our previous opinion, due to its interlocutory nature, was based on the government's pretrial proffer of what evidence would appear at trial about the Maryland conspiracy. Dickerson argues now that "[d]uring trial, evidence was introduced that severely undercut the Government's proffer." He relies most heavily on the testimony of Alfonso, who supplied Hanks on one occasion during the time period of the Florida conspiracy and who was also a large scale supplier of Dickerson during most of the Maryland conspiracy. Alfonso's testi-mony, posits Dickerson, "demonstrated that the Florida and Maryland conspiracies were one and the same."

The Double Jeopardy Clause protects a criminal defendant from having to "run the gantlet" of two trials for the same offense. *Green v. United States*, 355 U.S. 184, 190 (1957). Because conspiracy cases present a special difficulty when determining whether the second prosecution is for the "same offense," we have adopted a "flexible test" that takes into account the "totality of the circumstances" and applies five factors. *United States v. Ragins*, 840 F.2d 1184, 1188 (4th Cir. 1988). The five factors are:

> (1) the time periods covered by the alleged conspiracies; (2) the places where the conspiracies are alleged to have occurred; (3) the persons charged as co-conspirators; (4) the overt acts alleged to have been committed in furtherance of the conspiracies, or any other descriptions of the offenses charged which indicate the nature and scope of the activities being prosecuted; and (5) the substantive statutes alleged to have been violated.

*Id*. at 1189.

In this case, the time period alleged in the indictment, which is the first factor to consider, does not overlap with that alleged in Florida. The Florida indictment covered Dickerson's activities in a conspiracy from 1988 to 1991. The Maryland indictment, in contrast, alleged Dickerson's participation in a conspiracy "in or about 1992, up to and including on or about November 21, 1997." Therefore, the time periods are distinct and, this factor suggests two conspiracies.

The second factor involves the geographic locations of the conduct alleged to constitute the two conspiracies. As charged and prosecuted, the Florida conspiracy was centered around Nelson and Hanks in Florida. The Nelson/Hanks organization distributed cocaine from Miami, Florida to other states. In particular, Williams delivered cocaine to Bonds in Chicago and Randall in Atlanta, as well as to Dickerson in Philadelphia and in Greenbelt, Maryland. During the Florida conspiracy, Dickerson resold cocaine on the Eastern Shore of Maryland.

The Maryland conspiracy, in contrast, centered around Dickerson's distribution efforts in Maryland. His two main sources for these efforts were Sears, who supplied Dickerson from Florida, and Alfonso, who supplied Dickerson from California. There was also vague evidence that Dickerson had a third source of supply in New York.

Even though, as we concluded in our earlier opinion, there are "some similarities" between the geographic locations of the two conspiracies, the existence of "several differences" between them provides support for the conclusion that there were distinct Florida and Maryland conspiracies. *Dickerson*, 2000 WL 135112, at *5. The Florida conspiracy was centered in Florida and involved distribution to Georgia, Pennsylvania, Maryland, and Illinois. The Maryland conspiracy was centered in Maryland and was supplied with cocaine from Florida, California, and New York. There was an overlap of supply from Sears but Sears' supply to Dickerson lasted for only six months of the five-year Maryland conspiracy. Most of Dickerson's supply was from Alfonso in California. This factor thus permits a finding of separate conspiracies. *Cf. United States v. MacDougall*, 790 F.2d

1135, 1148 (4th Cir. 1986) (although both conspiracies were "heavily involved" in South Carolina, the fact that one conspiracy operated in different states along the east coast permitted conclusion that conspiracies were separate).

The third factor involves consideration of whether the two conspiracies were operated by the same co-conspirators. This analysis does not focus solely on the co-conspirators charged in the indictment but also on those actually "acting as co-conspirators." *MacDougall*, 790 F.2d at 1144. Moreover, we have concluded that it is more meaningful to focus on "principal players" such as "the suppliers, contacts and buyers" than on every possible co-conspirator. *Dickerson*, 2000 WL 135112, at *7.

In the Florida conspiracy, the suppliers were Nelson and Hanks. The buyers and distributors were Dickerson, Randall and Bonds. In the Maryland conspiracy, the suppliers were Sears, Alfonso, and an unnamed New York source. The buyers and distributors were Dickerson and Randall, although we do not know any details about Randall's distribution network or how he operated. Thus, the principal players are substantially different. Only Dickerson and Randall overlapped.

Dickerson takes issue with this conclusion because, first, he notes that Sears operated a stash house in the Florida conspiracy and was a supplier in the Maryland conspiracy. But this overlooks the fact that those roles are materially different. Moreover, Sears' involvement in the Maryland conspiracy was only for six months. Second, Dickerson notes that Alfonso supplied Hanks with 15 kilograms of cocaine during the Florida conspiracy and he was Dickerson's main source of supply during the Maryland conspiracy. This was, however, a minimal overlap based on the vastly different magnitude of Alfonso's roles in the two alleged conspiracies. Alfonso supplied Hanks on only one occasion, whereas he was Dickerson's regular supplier of hundreds of kilograms. Had Alfonso repeatedly supplied the Florida conspiracy, the conclusion might have to be different. But a one-time drug sale to the prior conspiracy and no evidence of further involvement in that conspiracy is not sufficient to make Alfonso a "principal player" in it. Third, Dickerson points to some overlap in the smaller players in the conspiracy. Perkins, for example, bought drugs from

Dickerson during both conspiracies, while Blanks was both a courier and a buyer during both conspiracies. While this also shows some overlap, our most relevant inquiry must extend to principal players, and neither Perkins nor Blanks could be considered principal players in either conspiracy.

The fourth factor focuses on the extent to which the two conspiracies involve the same overt acts. Strictly speaking, because the time frames of the two indictments do not overlap, the overt acts in furtherance of each conspiracy do not overlap. Indeed, the Maryland indictment alleges only two overt acts — one in 1996 and the other in 1997 — both of which occurred in Maryland long after the end of the Florida conspiracy in 1991 when Hanks died. Also, as the district court concluded, the overt acts in the Florida conspiracy were "concentrated . . . in Florida includ[ing] the multi-kilogram deliveries from Nelson and Hanks through Williams to Mr. Dickerson, Mr. Randall, and Mr. Bonds." Furthermore, looking at all of the overt acts, the two conspiracies' "nature and scope" differed. The Florida conspiracy, as prosecuted, focused on Nelson's and Hanks' supply of drugs to mid-level distributors such as Bonds, Randall and Dickerson. The Maryland conspiracy, in contrast, focused on Dickerson's efforts to obtain a steady supply of cocaine to distribute to lower-level distributors and users on the Eastern Shore. Thus, application of this factor suggests two conspiracies.

The final factor of the *Ragins* test is whether the substantive statutes charged are the same. Indeed, both indictments charged Dickerson with conspiracy to violate the same statute, 21 U.S.C. § 841. But as we pointed out earlier, this is a "minor similarity compared to the other factors." *Dickerson*, 2000 WL 135112, at *7.

The line between the Florida conspiracy and the Maryland conspiracy cannot be perfectly drawn. But it is certain that the Florida jury convicted Dickerson only for activities conducted between 1988 and 1991 involving the Nelson/Hanks organization. Likewise, the jury in this case considered none of those activities but limited itself to conduct between 1992 and 1997 involving Dickerson's own distribution system supported by other suppliers. While there were, indeed, overlapping personnel and some overlap in the geographical scope of each conspiracy, it is apparent that the Florida jury and the Maryland jury

found different conspiracies involving different conduct. We can thus conclude confidently that Dickerson was not tried or punished twice for the same offense. Whether a jury could have found all of the conduct amounting to a single conspiracy does not fully address the problem. In this case, two juries were presented with conduct purportedly constituting separate conspiracies, and each jury, acting on substantial evidence, found different conspiracies. Accordingly, we reject Dickerson's double jeopardy defense.

### III

Dickerson contends second that the district court erred in denying his motion for judgment of acquittal because "the Government was allowed to introduce evidence of multiple conspiracies" during the trial. He argues that there were at least three conspiracies at work in the "Maryland conspiracy," based on his sources of supply — one involving Sears, one involving Alfonso, and one involving the unnamed New York source. He also argues there were separate conspiracies based on his distribution network — for example, one involving Perkins and one involving Blanks. He points out that the suppliers did not have any idea how the distribution of the cocaine was effected and therefore could not have entered into any agreement with the persons to whom he distributed cocaine. Dickerson summarizes that "[t]here was no evidence that Mr. Sears, Mr. Alfonso or the alleged New York source shared the same objective or the same goal as the Dickerson distribution network."

The jury found one "Maryland conspiracy" as charged, and we will affirm the jury's finding "unless the evidence, taken in the light most favorable to the government, would not allow a reasonable jury so to find." *United States v. Harris*, 39 F.3d 1262, 1267 (4th Cir. 1994) (internal quotation marks omitted).

The district court's instruction to the jury properly placed the issue before it. It instructed:

> You are further instructed with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is

proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants of that charge. However, if you decide that such a conspiracy did exist, you must then determine who the members were; and, if you should find that a particular defendant was a member of some other conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty, you must unanimously find that such defendant was a member of the conspiracy charged in the indictment and not a member of some other separate conspiracy.

Thus, were "the evidence at trial [to] establish[ ] facts materially different from those alleged in the indictment" — in this case, the allegations of a single conspiracy — there would be a possibility of impermissible "variance," which could be grounds for acquittal. *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994). The question thus becomes whether substantial evidence of a single conspiracy was presented to support the jury's finding of a single conspiracy. We conclude that such evidence was presented.

The government showed that there was substantial overlap of "key actors, methods and goals" within the Maryland conspiracy because Dickerson directed the drug distribution network in Maryland. He formulated agreements with three suppliers (Sears, Alfonso, and the New York source) to provide him with cocaine for distribution on the Eastern Shore. In distributing the cocaine, he provided smaller quantities to mid-level distributors such as Perkins, Jones, and Blanks, who in turn distributed it to street-level drug users.

Although Dickerson may be correct in observing that Sears, Alfonso, and the New York source did not have an agreement directly with each other, each had an agreement with Dickerson, who was the hub of the single conspiracy organized by Dickerson to serve the Eastern Shore market. We have observed that a conspiracy may be a "loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate

demands of a particular drug consumption market." *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993). The important consideration is whether the participants knew, from the "'vastness and regularity of their own dealings'," that the illegal efforts of others made their dealings possible, and whether the actor showed a "'substantial level of commitment to the conspiracy . . . by engaging in a consistent series of smaller transactions' that furthered its ultimate object of supplying the consumer demand of the market." *Id*. (quoting *United States v. Burman*, 584 F.2d 1354, 1356 (4th Cir. 1978), and *United States v. Edwards*, 945 F.2d 1387, 1393 (7th Cir. 1991)).

Based on *Banks*, the parallel suppliers in this case had a "mutual interest in sustaining the overall enterprise" through their agreements with Dickerson to supply him with cocaine to sell on the Eastern Shore, the same mid-level distributors had an agreement with Dickerson to sell the cocaine to drug users, and the same methods of transporting cocaine and cash were used throughout the conspiracy. 10 F.3d at 1054. Also, each co-conspirator was aware of Dickerson's purpose in supplying cocaine to the Eastern Shore, and each engaged in "vast" and "regular" dealings with him.

Viewing the evidence in the light most favorable to the government, we conclude that it was not irrational for a jury to have decided that there was only one conspiracy at work in Maryland.

IV

Dickerson next contends that because the prosecutor improperly told the jury during closing argument that as part of the conspiracy Alfonso was also supplying marijuana, a fact not charged in the indictment, he is entitled to a new trial.

During the trial, the government used a chart to show how Dickerson's suppliers sent him repeated shipments of cocaine, through couriers such as Fox and the Kumpfs, between January 1995 and November 1997. Undermining the chart to some extent, Alfonso and the couriers testified that they had made several trips to Baltimore during the stated period that were not on the chart. To explain these trips, the government proffered, at a bench conference, that it would show that these trips involved shipments of marijuana, even though

the indictment did not cover marijuana. The court ruled that the government could not introduce this evidence. Arguing with the ruling, the government prosecutor said, "But then the government is precluded from explaining that the reason [Alfonso] was here was because it was marijuana trips." The court stuck with its ruling, saying, "it's not in evidence. So that you are precluded."

Because of this ruling, the government was unable to explain why Alfonso and the Kumpfs had made several trips to meet Dickerson during 1995 to 1997, and Dickerson's counsel, as the government predicted to the court, took advantage of the absence of this evidence, arguing in closing argument that Alfonso and the Kumpfs were meeting someone else because the government had not shown that there were any cocaine deliveries made during some of the relevant time frame:

> Now what does [this inconsistency] tell you? It tells you one of two things. Mr. Alfonso is lying to you about something because it means that there is a different relationship between Mr. Dickerson and Mr. Alfonso . . . . That there is a different relationship between Mr. Dickerson and Mr. Alfonso than you have heard about other than this cocaine deliveries or that Mr. Alfonso has been delivering drugs to someone else in Baltimore that you ain't heard about and that Ms. Kumpf is meeting with someone else in Baltimore in March and January of 1995 that you have not heard about. You have to weigh that when you consider the testimony of Mr. Alfonso and Ms. Kumpf when they tell you that they're coming here to meet Frank Dickerson to pick up money for these cocaine deals.

Believing that this argument was an unfair inference to be drawn, particularly in light of the known facts, the government sought to explain the situation in its rebuttal argument as follows:

> This stuff about the early trips in early 1995 that were taken by Mr. Alfonso, Ms. Kumpf and whatnot and I don't know if there was a, I think that was just Ms. Kumpf and Mr. Alfonso that's referred to there. Well, frankly, ladies and gentlemen, the Kumpfs both testified as you may recall that

they were part of a marijuana and cocaine conspiracy with Mr. Alfonso. This trial is only about a cocaine conspiracy starting in 1992. There was other evidence stricken from the record that you are not to consider. . . .

When defense counsel objected and moved for a mistrial, the court lectured the prosecutor, "You can't tell them about evidence that was stricken from the record." The prosecutor sought to explain that the government was caught in a "Catch-22," and when she continued to argue, the court berated her and said, "Stop. Stop. You are absolutely wrong to tell the jury about evidence that was stricken." The court then instructed the jury not to consider the prosecutor's comment or to consider any stricken evidence. The court, however, refused to order a new trial.

To obtain a new trial, Dickerson must show first that the prosecutor's remarks were in fact "improper." *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993). Second, he must show that "such remarks or conduct . . . prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *Id.* (internal quotation marks omitted). We review the district court's denial of a motion for a new trial for abuse of discretion. *United States v. Dorlouis*, 107 F.3d 248, 254 (4th Cir. 1997).

Dickerson has probably established that the prosecutor's remark was, in view of the district court's earlier ruling, improper. The government argues that because the prosecutor did not describe the excluded evidence and only referred to the fact that some evidence was excluded, its argument was not improper. But when that argument is juxtapositioned with the prosecutor's statement about a marijuana conspiracy, a reasonable juror could have drawn the conclusion that the other trips to Baltimore were to deal in marijuana.

Even if Dickerson has met the first element of *Mitchell*, we conclude that he is unable to demonstrate any prejudice. In reaching this conclusion, we apply six factors to our analysis: (1) the degree to which the prosecutor's remarks may mislead the jury or prejudice the defendant; (2) whether the remarks were "isolated or extensive"; (3) whether, absent the improper remarks, the strength of the other evidence would be enough to convict the defendant; (4) whether the

comments were "deliberately placed before the jury to divert attention to extraneous matters"; (5) whether defense counsel's improper conduct "invited" the remarks; and (6) whether the jury received curative instructions. *Mitchell*, 1 F.3d at 241; *see also United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998).

First, given all of the other evidence about large amounts of cocaine distributed by Dickerson, it is difficult to see how this one statement that implicitly referenced a few marijuana dealings somehow misled the jury or prejudiced the accused. *Compare Wilson*, 135 F.3d at 302 (finding prejudice where prosecutor referred to uncharged and unproven murder by defendant). Second, the remark was isolated and not repeated. Third, there was substantial competent evidence of Dickerson's guilt — including the testimony of numerous co-conspirators and physical evidence such as the seized cocaine. Fourth, there is no evidence that the prosecutor sought to distract the jury with extraneous matters; rather, she wanted to ensure that Alfonso's testimony was not entirely discredited by the defense counsel on an inaccurate or misleading inference. Fifth, while the comment was not justified by any clearly improper conduct by defense counsel, it was nevertheless motivated by the prosecutor's perception that defense counsel was misrepresenting the true facts, even though they were not in the record. Finally, the judge did give an adequate curative instruction.

Based on our application of these factors, we readily conclude that Dickerson has not shown that he was prejudiced and therefore a new trial is required.

V

Dickerson contends that the district court erred by admitting the transcripts of five taped conversations — four conversations between Troy Perkins and James Cephas and one conversation between Perkins and Jimmy Jones. He argues that the four Perkins/Cephas conversations do not fit the co-conspirator exception to hearsay under Federal Rule of Evidence 801(d)(2)(E) because (1) Perkins was working for the government at the time; (2) Perkins had said that he no longer dealt drugs with Dickerson; and (3) Cephas had never directly dealt drugs with Dickerson but only with Jones.

Similarly, he argues that the Perkins/Jones conversation should be excluded because (1) Perkins was a government informer; (2) Jones indicated during the conversation that he had not spoken to Dickerson in several months; and (3) this discussion was merely "idle conversation" and not in furtherance of a conspiracy. *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986) ("idle conversation" that references criminal activity does not constitute statement "in furtherance of" the conspiracy).

We review the admission of evidence for abuse of discretion. *United States v. Squillacote*, 221 F.3d 542, 563 (4th Cir. 2000).

First, we have permitted co-conspirator statements to be introduced when the conversation is between a government informer and a co-conspirator as long as there is independent proof that the co-conspirator declarant was actually in a conspiracy with the defendant challenging the introduction of the statement. *See, e.g.*, *United States v. Neal*, 78 F.3d 901, 904-06 (4th Cir. 1996); *United States v. Capers*, 61 F.3d 1100, 1105-06 (4th Cir. 1995). Although Cephas did not deal directly with Dickerson, there is independent evidence that Dickerson supplied Jones, who then supplied Cephas, supporting the conspiratorial relationship between the three individuals. Therefore, the four Perkins/Cephas conversations were properly admitted.

On the Perkins/Jones conversation, we conclude that it was more than "idle conversation," as Dickerson contends. In *Urbanik*, for example, the conversation happened after a drug deal, constituted only a fraction of the entire conversation, and occurred while the co-conspirators engaged in an unrelated activity (weight-lifting). 801 F.2d at 698-99. In contrast, the Perkins/Jones conversation, which was set up at Perkins' direction, was entirely about drug dealing. Jones discussed his past drug relationship with Dickerson and noted that he still owed Dickerson money for drugs, indicating that their relationship — though somewhat stagnant — was ongoing.

Accordingly, we conclude that the district court did not abuse its discretion in admitting this evidence.

VI

Finally, Dickerson claims several errors in his sentence, based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000). He concedes, however,

that he is raising these sentencing issues to preserve them for further appeal.

First, Dickerson challenges the fact that his prior conviction was not submitted to the jury to be determined beyond a reasonable doubt. However, *Apprendi* forecloses this argument entirely because evidence of prior convictions need not be submitted to the jury. 530 U.S. at 490.

Second, Dickerson argues that *Alamendarez-Torres v. United States*, 523 U.S. 224 (1998), is incorrectly decided. This case, however, remains binding precedent.

Finally, Dickerson argues that his base offense level was wrongly determined. He notes that the United States Supreme Court has granted *certiorari* in *United States v. Harris*, which may decide this issue. 243 F.3d 806 (4th Cir. 2001), *cert. granted*, 122 S. Ct. 663 (U.S. Dec. 10, 2001) (No. 00-10666). For now, however, the issue is foreclosed by *Harris*, as Dickerson concedes.

## VII

For the reasons given, the judgment of the district court is

*AFFIRMED*.